0695

William E. DARBY, d/b/a Resort Publications, Respondent v. WATER-BOGGAN OF MYRTLE BEACH, INC. and Waterboggan of North Myrtle Beach, Inc., Appellants.

(344 S. E. (2d) 153)

Court of Appeals

*Dennis H. Smith, of Joseph, Harris & Hanna,* Surfside Beach, *for appellants.*

*J. Dwight Hudson,* Conway, *for respondent.*

Heard Feb. 18, 1986.

Decided May 5, 1986.

BELL, Judge:

This is an action in contract on an account stated brought by William E. Darby, doing business as Resort Publications, against Waterboggan of Myrtle Beach, Inc., and Waterboggan of North Myrtle Beach, Inc., two corporations owned by Dwight L. Myers.[1] The complaint alleged that Waterboggan entered a written contract for advertising in *Coast* magazine, which Darby publishes. Darby alleges that he performed the contract, but Waterboggan refuses to pay the contract price. Waterboggan admitted the contract, but pleaded the defense of failure of consideration. Waterboggan also counterclaimed for fraud in the inducement. The circuit court, sitting with a jury, directed a verdict on Darby's contract action, but permitted Waterboggan's counterclaim for fraud to go to the jury. The jury returned a verdict in favor of Darby. The court then entered judgment against Waterboggan for the contract price plus interest and attorney's fees. Waterboggan appeals. We affirm.

The appeal presents two issues for our decision: (1) did the trial judge err when he directed a verdict on the contract action; and (2) did the trial judge err in failing to submit the question of mitigation of damages to the jury.

On appeal from a directed verdict, this Court must view the evidence and the inferences therefrom in the light most favorable to the appellant. *Benya v. Gamble,* 282 S. C. 624, 321 S. E. (2d) 57 (Ct. App. 1984). Viewed in the light most favorable to Waterboggan, the evidence tends to establish the following facts.

Darby is the owner and publisher of *Coast* magazine, a tourist information guide distributed locally in the Myrtle Beach area and throughout the eastern United States and

---

[1] For convenience, "Waterboggan," as used throughout this opinion, refers to Waterboggan of Myrtle Beach, Inc., and Waterboggan of North Myrtle Beach, Inc., collectively.

Canada. Waterboggan is a corporation owned by Dwight L. Myers which operates two waterslide amusements in the Myrtle Beach area.

On January 6, 1980, Waterboggan executed a one year written contract with Darby, calling for forty weekly insertions of a full page, four color advertisement featuring both Waterboggan amusements in *Coast* magazine at a charge of $280.00 per insertion. All forty insertions of the advertisement were printed in advance at the beginning of the contract period and were then tipped into the magazine each week when it was printed. For this reason, the contract for the advertisements provided it was "noncancellable" or entire.

On January 12, 1980, a companion contract was executed by the same parties. This contract called for Darby to publish 500,000 discount coupons offering Fifty Cents off the normal admission price for the Waterboggan amusements. The coupons were to be printed approximately every two weeks and distributed during the peak tourist season from April through August. Unlike the advertising contract, the coupon contract could be cancelled by giving the publisher written notice of cancellation. The contract price was $1,500 payable, $500 when the contract was signed, $500 when Waterboggan approved the proofs of the coupon, and $500 upon publication.

Waterboggan paid $200 down on the coupon contract in January 1980. After that it admittedly made no further payments on either contract.

Waterboggan had placed advertisements in *Coast* magazine in previous years. These were always full page, four color advertisements. In 1977 Waterboggan negotiated an "exclusive" contract with Darby which expressly provided that Waterboggan would be the only waterslide amusement advertised in *Coast*. For about a month *Coast* printed an advertisement for an amusement park which pictured a waterslide as one of the amusements. When Myers complained that the amusement park advertisement violated his "exclusive" contract, Darby, in order to retain Waterboggan's goodwill as a customer, agreed to give Waterboggan all its advertising under the contract at no charge. In suc-

ceeding years, however, Darby refused to enter into an "exclusive" contract with Waterboggan.

The 1980 contracts were negotiated by Myers and Bonnie Shine, a sales agent for *Coast.* According to Myers, he did not originally intend to advertise in the magazine in 1980 because of the expense involved. Shine, however, sold him on the coupon promotion which was new that year. Myers testified that Shine told him it was necessary to purchase a full page, four color advertisement to be eligible for the coupon promotion.[2] In order to take advantage of the coupon promotion, Myers agreed to the full page advertisement.

Both parties agree that during the negotiations Myers also asked for an "exclusive" contract with *Coast.* Shine told Myers that *Coast* no longer offered exclusive contracts to its customers. The written contracts executed by the parties were not exclusive contracts. Furthermore, each contained the following provision, printed in boldface type:

NO VERBAL AGREEMENTS OR COMMITMENTS ASIDE FROM THIS CONTRACT WILL BE BINDING.

Myers testified that he was familiar with the contents of the contracts and knew they were not exclusive.

While admitting these facts, Myers testified that during the negotiations Shine promised him Waterboggan's discount coupon would be the only discount coupon for a waterslide published by *Coast* that year.[3] Myers stated that without this assurance, he would not have signed either contract.

Darby began performing the contracts in March 1980. In July 1980, Myers discovered that *Coast* was running advertisements for other waterslides and was also printing and distributing discount coupons of one dollar or more for them in competition with Waterboggan. Some of the competitors'

---

[2] Shine denied making any such representation. She testified that she told Myers only that he must purchase an advertisement in *Coast*, not that it must be a full page, four color advertisement.

[3] Shine emphatically denied making the statement. According to her testimony, she made it clear that *Coast* could not accede to Myers's request for an "exclusive" contract.

advertisements were two color (black and white) insertions of less than a full page. Upon making this discovery, Myers confronted Shine and told her he would not pay for the advertisements and coupons. Shine offered to let Waterboggan cancel the coupon contract if it wished, but Waterboggan declined to do so. Darby completed performance of the contracts and then sued Waterboggan for the contract price.

## I.

The trial judge directed a verdict on Darby's contract cause of action, but permitted Waterboggan's counterclaim for fraud to go to the jury. Waterboggan claims that if there was enough evidence to send the counterclaim to the jury, the contract cause of action should also have been decided by the jury, because fraud was raised as an affirmative defense to the contract.

In order to establish a claim or defense of fraud in the inducement, a party must prove, among other elements of the tort: (1) that the alleged fraudfeasor made a false representation relating to a present or preexisting fact; (2) that the alleged fraudfeasor intended to deceive him; and (3) that he had a right to rely on the representation made to him. *See King v. Oxford,* 282 S. C. 307, 318 S. E. (2d) 125 (Ct. App. 1984); *Emerson v. Powell,* 283 S. C. 293, 321 S. E. (2d) 629 (Ct. App. 1984).

In this case, Waterboggan failed to present evidence establishing these crucial elements of fraud. At most, taking Waterboggan's version of the conflicting testimony as true, the evidence established that Shine made promises or statements as to future events which later were unfulfilled. Such evidence may establish a breach of promise; it is not evidence of fraud. *See Emerson v. Powell, supra.*

Moreover, there is no evidence Shine made the statements with an intent to deceive. This is clear from Myers' own testimony:

A. My testimony is that Ms. Shine represented ... to me, when we further discussed it, that I would not have competitors ... on the coupon deal for the magazine, if I would be the first, and of course, ... take the full color ad also. And that's what I bargained for, and it's certainly not what I got.

Q. So you just think you didn't get all you bargained for, not that she intended to mislead you, but that you just didn't get all you bargained for?
A. Well, here again, sir, I do now know what her intentions were. I know that she did not follow through with what she promised me.
Q. Even though those promises aren't in the contract?
A. I'm not denying a thing that's in the contract.

Finally, Waterboggan failed to prove it had a right to rely on the statements, assuming they were made. During negotiations, Myers asked for an exclusive contract and was expressly refused. He was familiar with the terms of the contracts he eventually signed and knew they were not exclusive. The contracts themselves stated that no verbal agreements or commitments aside from the written contract were binding. One cannot complain of fraud in the inducement when his reliance is so completely unjustified by the facts known to him when he enters the bargain.

In view of Waterboggan's failure to present evidence establishing the defense of fraud, the trial court properly withdrew that issue from the jury.[4] Since Waterboggan admitted the making of the contracts and there was no question they had been fully performed by Darby, the trial judge properly granted the motion for a directed verdict on the contract cause of action.

## II.

Waterboggan also argues that the trial judge should have submitted the issue of Darby's failure to mitigate damages to the jury. Waterboggan claims there was a failure to mitigate damages, because Darby continued to print both the full page advertisement and the discount coupons after July 7, 1980, the day Myers told Shine he did not intend to pay anything on either contract.

It is undisputed that when Myers indicated he did not intend to pay Shine offered Waterboggan the opportunity to cancel the coupon contract. Waterboggan

---

[4] If the trial judge made an error, it was to submit the counterclaim for fraud to the jury rather than directing a verdict for Darby. No exception was taken to this ruling, however, and the jury's verdict in favor of Darby on the counterclaim rendered the error harmless in the event.

declined to cancel, thereby electing to stand on the contract. In these circumstances, Darby's decision to continue performance was entirely reasonable. To discontinue performance might have been a breach of contract. Having refused to cancel when offered the opportunity to do so, Waterboggan cannot now complain that Darby continued to perform the coupon contract.

As regards the advertising contract, Darby's evidence showed that all of the full page advertisements had already been printed prior to July 7, 1980. Waterboggan adduced no evidence to the contrary. Moreover, Waterboggan failed to prove that publication of the remaining advertisements after July 7, 1980, materially enhanced Darby's damages. In other words, there was no showing that damages would have been significantly reduced had *Coast* ceased publishing the advertisement.

Waterboggan had the burden of proof on the issue of mitigation of damages. *See Tri-Continental Leasing Corp. v. Stevens, Stevens & Thomas, P.A.*, 287 S. C. 338, 338 S. E. (2d) 343 (Ct. App. 1985). In view of Waterboggan's failure to present proof that the damages were avoidable, the trial judge correctly determined the issue should not go to the jury.

The judgment of the circuit court is accordingly

Affirmed.

SANDERS, C. J., and GARDNER, J., concur.