1037

Robert F. ANDERSON, Trustee of the Estate of Billy E. Graham, Debtor, and Isla M. Graham, Executrix of the Estate of Billy E. Graham, Respondents-Appellants v. The CITIZENS BANK, J. B. Carter and Charles Dorn Smith, Jr., Bill Prince, and Carolyn S. Thompson, and R. D. Thompson, Jr., as Guardian ad Litem for Robert D. Thompson, individually and d/b/a/ B. G. Farms, Defendants, of whom The Citizens Bank, Charles Dorn Smith, Jr., Bill Prince, and Carolyn S. Thompson and R. D. Thompson, Jr., as Guardian ad Litem for Robert D. Thompson, individually and d/b/a B. G. Farms, were Appellants-Respondents.

(365 S. E. (2d) 26)

Court of Appeals

*W. E. Jenkinson, III,* of *Jenkinson & Jenkinson,* of Kingstree, and *David W. Keller, Jr.,* of *McGowan, Keller, Eaton, Brodie & Elmore,* of Florence, *for appellants-respondents.*

*R. Wayne Byrd,* of *Scott & Byrd, John S. Wilkerson, III,* and *Elbert S. Dorn,* of *Turner, Padget, Graham & Laney,* Florence, *for respondents-appellants.*

Heard Sept. 21, 1987.

Decided Oct. 26, 1987.

Rehearing Denied Dec. 11, 1987.

BELL, Judge:

This is one of several suits arising from the business failure of Billy E. Graham, a large scale farmer in the Pee Dee. *See also Graham v. Prince,* 293 S. E. 77, 358 S. E. (2d) 714 (Ct. App. 1987). Graham commenced this action against the Citizens Bank of Olanta, South Carolina, alleging (1) breach of contract, (2) breach of contract accompanied by a fraudulent act, and (3) violation of the South Carolina Unfair Trade Practices Act, all in connection with loans the

bank made to Graham or for his benefit. He also stated claims against J. Bryan Carter, managing officer of the Bank, and both Charles Dorn Smith, Jr., and Robert Davis Thompson, two directors of the Bank, for (1) fraud and (2) violation of the Unfair Trade Practices Act. Finally, Graham sued Thompson, Smith, and Bill Prince, individually and as partners in a general partnership known as B. G. Farms, for (1) breach of a lease agreement under which Graham leased certain farmlands to Thompson, and (2) violation of the Unfair Trade Practices Act.

During the pendency of the suit, Robert F. Anderson, Graham's trustee in bankruptcy, was joined as a party plaintiff, and upon Graham's death, Isla M. Graham, executrix of Graham's estate, was substituted as his personal representative. Additionally, Thompson was adjudicated incompetent and is now represented in the litigation by Carolyn S. Thompson and R. D. Thompson, Jr., his Guardians ad Litem.

The case was tried by jury. During the course of trial, the judge dismissed the case against Carter. At the close of the evidence, the judge directed verdicts for all defendants on the Unfair Trade Practices causes of action. The jury then found for the Bank on the remaining causes of action against it. However, the jury returned verdicts (1) for fraud against Smith and Thompson, individually, and (2) for breach of the lease agreement against the B. G. Farms' partners.

Smith and Thompson appeal the fraud verdict. The B. G. Farms' partners appeal the breach of lease verdict. Anderson and Graham cross appeal challenging: (1) the amount of damages awarded for breach of the lease; (2) the denial of prejudgment interest on those damages; and (3) the directed verdict on the Unfair Trade Practices cause of action against Citizens Bank. No appeal has been taken from the dismissal of Carter or the verdict in favor of Citizens Bank. We reverse the fraud verdict against Smith and Thompson and the denial of prejudgment interest, but otherwise affirm the judgment of the circuit court.

Although the evidence presented at trial was complex, the facts material to this appeal are reasonably straightforward.

Graham owned over three thousand acres of farmland in the Pee Dee. He acquired much of this property by borrowing from the Federal Land Bank during the 1960's and 1970's. As of 1979, his total mortgage indebtedness with the Land Bank exceeded $1.7 million. His Land Bank payments were due annually on January 1st.

In addition, Graham borrowed working capital from year to year to finance his farming operations. From 1970 through 1979 he borrowed between $1 million and $1.4 million annually from the Production Credit Association to make his crop. These loans were typically secured by crop liens. He would borrow the money at the first of the year and repay it in the fall out of the proceeds from his crops.

Both 1979 and 1980 were bad crop years for Graham. As a result, he was unable to service his debts without further borrowing. He rescheduled his long term debt and used federal disaster loans to continue farming. In 1980 he borrowed $1.5 million from the Farmers Home Administration (FmHA) to finance operations for that year. This indebtedness was secured by mortgages on his house, land, and equipment as well as a lien on his crops. During this period, Graham also purchased equipment and supplies on credit from various farm suppliers; and he borrowed money from friends.

In early 1981, Graham, still heavily indebted, obtained additional operating loans, totalling $648,000, from the FmHA. These loans were secured by crop liens and were to be repaid from Graham's 1981 crops. Unlike the two previous years, 1981 was a good crop year. Graham was so far in debt, however, that he used his 1981 crop money to pay creditors other than the FmHA. By the end of the year, he owed the FmHA almost $800,000 for the 1981 loans, but he did not have the money to pay them. To make matters worse, his annual payment to the Land Bank, in the amount of $234,000, was due in January 1982.

Graham, now in serious financial trouble, approached the Citizens Bank late in 1981 to seek financing for his 1982 farming operations. Graham made a loan application for $900,000. On January 18, 1982, the Bank approved a loan of $800,000 to be secured by Graham's 1982 crops, subject to two conditions: (1) the FmHA would have to subordinate its

existing crop liens to the Bank; and (2) the Bank would have to obtain 100% participation on the loan from a corresponding bank. Graham clearly understood and agreed to both conditions.

Graham's main cash crop was tobacco. The federal government regulates tobacco markets. It allots each farmer a maximum poundage he may sell each crop year. The holder of an allotment may lease it to another farmer instead of farming it himself. Under federal regulations, tobacco allotments must be assigned to a farm by April 15 of each year or they expire. Each year, Graham leased several hundred thousand pounds of allotments from other farmers. To obtain allotments at their lowest cost, one must lease them early in the crop year. This posed a problem for Graham in January, 1982, because he had not yet obtained his operating cash for that year.

Since Graham's $800,000 operating loan could not be processed before he needed money to purchase tobacco allotments, Citizens Bank agreed to provide him short term "bridge" financing. As Graham bought tobacco allotments, the Bank agreed to advance the purchase money in increments of $50,000. In return, Graham would sign promissory notes due April 5, 1982, and pledge the tobacco allotments as collateral. Once Graham obtained his operating loan, the notes would be paid from the loan proceeds. If he was unable to obtain an operating loan, the Bank would sell the pledged allotments before they expired on April 15 and apply the proceeds to retire the notes. Under this arrangement, Citizens Bank had loaned Graham over $250,000 for tobacco leases by February 22, 1982.

On March 12, Graham learned that Citizens Bank could not find a corresponding bank to take up 100% participation on the loan. Graham likewise failed to obtain subordination from the FmHA, which insisted on certain conditions being met before it would subordinate. Among other things, the FmHA wanted Graham to repay his 1981 operating loan and cure his default with the Federal Land Bank. With no prospect of raising over $1 million to meet the conditions of subordination and with Citizens Bank's failure to obtain participation, Graham was unable to obtain his $800,000 operating loan.

In early April, 1982, Graham faced a critical financial situation. Although he paid off his 1981 FmHA operating loan on April 6, Graham was still in default on the notes to Citizens Bank and his mortgage payment to the Land Bank. Unable to finance his operations, Graham faced the prospect of having over $250,000 worth of tobacco allotments, held by the Citizens Bank, expire April 15 if not released to him and assigned to his farm. To compound his problems, the Federal Land Bank began foreclosing on his farm for failure to make his January, 1982, mortgage payment.

On April 14th and 15th, Graham met with representatives of the FmHA and Citizens Bank to work out an arrangement for farming in 1982. Under the pressure of registering his tobacco allotments before they expired, Graham agreed to lease the farm to Davis Thompson for 1982. Graham and Bill Prince would manage day to day operations, but Thompson would finance the farm. In return for the lease Thompson agreed to pay $80,000 rent. He also agreed in writing to make Graham's mortgage payment to the Land Bank out of the first proceeds from the 1982 crop. If the Land Bank would not accept payment from Thompson, Thompson agreed to pay the money directly to Graham from the first proceeds of the crop.

With the lease to Thompson executed, Citizens Bank released the pledged tobacco allotments to Graham. He registered them the afternoon of April 15th, just before they expired.

Due to personal problems, Thompson was unable to continue in the lease arrangement. On May 4, 1982, he assigned the lease to Bill Prince. Prince, Thompson, and Smith then formed a partnership, B. G. Farms, to operate the farm under the lease. In connection with these transactions, B. G. Farms assumed the obligation to make Graham's $234,000 mortgage payment to the Land Bank.

To operate the farm, the B. G. Farms' partners had to pay off many of Graham's preexisting debts to farm suppliers. They also provided new money to cover 1982 expenses. A dispute arose between them and Graham as to how these monies should be accounted for under the lease.

When it came time to sell the 1982 crops, another difficulty arose. The FmHA asserted a first lien on the crops to

satisfy Graham's indebtedness on the 1980 FmHA loans. To keep the proceeds of the crops from being tied up, the partners instituted a lawsuit in federal court to have the FmHA's lien declared invalid. Meanwhile, the Federal Land Bank was proceeding with its foreclosure action; the court had set December 6, 1982, as the date for the foreclosure sale.

In November, the partners and Graham worked out an arrangement to settle accounts for the 1982 crop year. Graham agreed to pay his 1982 loan installment of $133,611 to the FmHA before it was due. In exchange, the FmHA agreed to release its lien on the 1982 crops so the partners could pay off their operating expenses. Graham borrowed the money, paid the FmHA, and the FmHA released its lien for 1982. On November 8, 1982, the federal court action was dismissed with prejudice on the basis of this settlement.

On November 12, 1982, Graham, Thompson, Smith, and Prince met in the office of the Citizens Bank's attorney. There they executed an agreement and release, drafted by the Bank's attorney, whereby Prince, Smith, and Thompson agreed to "tender and offer to the Federal Land Bank the payment of Billy E. Graham which is now past due on his Note and Real Estate Mortgage to it, together with attorneys [sic] fees and costs due its attorney." In return, Graham agreed to release the partners "from all obligations arising, or which might hereafter arise, from the leasing by Billy E. Graham ... of his farm land for the crop year of 1982. . . ." The release went on to state:

> all parties hereby acknowledg[e] that it is not known whether the Federal Land Bank will accept such payment. In the event that such payment is not accepted, there will be no further obligation on the part of Bill Prince, Charlie Dorn Smith, Jr., and Robert D. Thompson to Billy E. Graham hereunder. The validity of this release does not depend upon whether the offered payment is accepted or not.

While the agreement and release was being executed, Thompson simultaneously signed a check, drawn on B. G. Farms account with Citizens Bank. The check, made payable to The Federal Land Bank, was for the sum of $296,312.37.

Written on the check was the notation "1982 Payment on Billy E. Graham Mortgage, together with attorney's fees and costs." Bank records show a balance of $22,806.21 in the account on November 12, 1982.

After the agreement and release was signed, Prince and the Bank's attorney immediately went with Graham to Sumter, where they first presented the check to the Federal Land Bank's attorney and then to an officer of the Land Bank. Neither would accept the check. Graham, Prince, and the attorney thereupon returned to Florence. The attorney took the check from Graham and retained it in his file.

Over the next several days, Graham attempted to work out an arrangement with the Land Bank to stave off foreclosure. He also asked the B. G. Farms' partners to pay the $296,312.37 directly to him so he could pay the Land Bank. The partners refused. When these efforts failed, Graham filed a bankruptcy proceeding in federal court to stop the foreclosure. This suit followed two years later.

## I.

At trial, the B. G. Farms' partners pleaded the November 12th release as a bar to Graham's suit for breach of the April 15th lease. Graham contended the release was invalid for failure of consideration. The judge submitted the validity of the release to the jury. The partners claim he should have ruled the release valid as a matter of law.

The release obligated the partners to tender Graham's past due payment to the Federal Land Bank. The partners argue they made a proper tender. There was evidence, however, from which the jury could have concluded otherwise.

To constitute a good tender, the law requires payment to be in money, for the proper amount due, made to the proper person, at the proper place. *See Aldrach v. South Carolina Light, Power & Railways Co.*, 101 S. C. 32, 85 S. E. 164 (1915) (payment must be in money); *Tolbert v. Fouche*, 129 S. C. 338, 123 S. E. 859 (1924) (proper amount due); *Maryland Cas. Co. v. Hanson Dredging, Inc.*, 393 So (2d) 595 (Fla. App. 1981) (tender must be made to proper person); *McFarland v. Christoff*, 120 Ind. App. 416, 92 N. E. (2d) 555 (1950); *Waller v. Brooks*, 267 Cal. App. (2d) 389, 72 Cal. Rptr. 228 (1968) (tender must be made at proper place). A tender to be sufficient must be kept good. *Tolbert v. Fouche, supra.*

A check is not tender. *Aldrach v. South Carolina Light, Power & Railways Co., supra.* Nor is payment offered to a person who is without authority from the creditor to accept it. *Rice v. Palmetto State Life Insurance Co.,* 196 S. C. 410, 13 S. E. (2d) 493 (1941). Likewise, payment offered at a place other than the creditor's place of business is not tender, unless the creditor agrees otherwise. *See Berley & Kyzer v. Columbia, Newberry & Laurens R Co.,* 82 S. C. 232, 64 S. E. 397 (1909); *Weyand v. Randall,* 131 A.D. 167, 115 N.Y.S. 279 (1909). The party alleging tender bears the burden of proving he has satisfied all the requirements for a good tender. *Moore v. Anchor Federal Savings and Loan Ass'n.,* 142 Ind. App. 681, 237 N. E. (2d) 114 (1968).

In this case, the partners gave Graham a check drawn on insufficient funds. There was no proof that the check was drawn for the amount due to the Land Bank; indeed, a cover letter drafted by the partners' attorney stated the check might not be for the correct amount. The partners took Graham to an attorney's office in Sumter to present the check. There was no evidence that the attorney had the authority to accept a tender on the Land Bank's behalf. When the attorney refused to take the check, Graham attempted to give it to a local branch officer of the Land Bank whom he fortuitously spied in a chicken restaurant. There was no evidence that the local officer was authorized to accept a tender from Graham or that a chicken restaurant in Sumter was an agreed place for tender to be made to the Land Bank, whose main offices are in Columbia. Graham was forced to return the unaccepted check to the partners' attorney the same day the check was drawn; there is no evidence the partners did anything to keep the tender good after that day.

The burden of proof was on the partners to show the release was valid. *See Corbett v. Lucas & Dotterer,* 15 S.C.L. (4 McC.) 323 (1827). Upon considering the evidence offered, the trial judge could easily have determined there were facts to go to the jury respecting failure of consideration for the release. We find no error in his ruling that the validity of the release was for the jury.

II.

Smith and Thompson assert the trial judge should have ruled as a matter of law that Graham failed to prove his claim of fraud against them.

Fraud is not presumed; it must be proven by clear, cogent, and convincing evidence. *King v. Oxford*, 282 S. C. 307, 318 S. E. (2d) 125 (Ct. App. 1984). An essential element of fraud is evidence that the defendant made a false representation to the plaintiff. *Darby v. Waterboggan of Myrtle Beach, Inc.*, 288 S. C. 579, 344 S. E. (2d) 153 (Ct. App. 1986).

Graham alleges the false representation consists of a statement to the effect that Citizens Bank had either obtained 100% participation by a corresponding bank on Graham's $800,000 loan or would obtain such participation without any problem. Graham, however, failed to allege or prove that such statements were made by either Smith or Thompson. There was some testimony from which it could be inferred that J. Bryan Carter implied there was no problem with participation by another bank. However, no proof whatsoever was offered which suggests Smith and Thompson made any representations to Graham concerning participation by another bank. Furthermore, there was no evidence that Smith and Thompson told Carter to make such statements.

At oral argument, Graham contended the "bridge" loans Citizens Bank made so he could lease tobacco allotments were tantamount to a representation by conduct that the Bank would make him an $800,000 operating loan. Even if we agreed that the Bank's willingness to help Graham with short term credit was a fraud on him (a proposition not at all apparent), there is no basis for imputing liability to Thompson and Smith, individually. Generally the law holds a person liable only for his own acts. *South Carolina Insurance Co. v. James C. Greene & Co.*, 290 S. C. 171, 348 S. E. (2d) 617 (Ct. App. 1986). Thompson and Smith neither said nor did anything which amounted to a false representation to Graham. Therefore, Graham's claim against them, individually, failed as a matter of law.

### III.

### A.

Anderson and Graham appeal the amount of damages awarded for breach of the lease. They claim the verdict of $234,000 is inconsistent as a matter of law with evidence showing the sum of $296,312.37 was due on the obligation arising from the lease. Their argument simply overlooks evidence of record that the amount to be paid was $234,000.

The promise involved is Thompson's written agreement of April 15, 1982, to pay Graham's past due Federal Land Bank payment. The evidence shows that $234,000 was past due on April 15, 1982. Thompson was to make payment from the first proceeds of the 1982 crop. If the Land Bank did not accept the payment, Thompson promised to pay Graham directly.

In May, 1982, the B. G. Farms' partners assumed Thompson's obligation to make the Land Bank payment. At that time, Prince gave Graham a postdated check, payable on August 10, 1982, to secure the obligation. The amount of the check was $234,000.

From this evidence, the jury could reasonably have concluded that the B. G. Farms' partners were obligated to pay $234,000 on August 10, 1982, either to the Federal Land Bank or to Graham. The verdict returned was, therefore, consistent as a matter of law with the evidence.

### B.

Anderson and Graham also appeal the refusal of the trial judge to award prejudgment interest on the breach of lease verdict.

The law allows prejudgment interest on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty. *Southern Welding Works, Inc. v. K & S Construction Co.*, 286 S. C. 158, 332 S. E. (2d) 102 (Ct. App. 1985).

When the B & G Farms' partners began operating under the assignment of Thompson's lease, they assumed

an obligation to pay $234,000 to the Land Bank or to Graham. The payment was due from the first proceeds of the 1982 crop. At the latest, those proceeds were available to the partners after the FmHA released its lien on the 1982 crop. When the Land Bank refused to accept payment on November 12, 1982, the partners became immediately obligated to pay Graham.

Since the partners owed Graham a sum certain by reason of the obligation they assumed from Thompson and since that sum was due not later than November 12, 1982, we hold Graham was entitled to prejudgment interest from that date. Accordingly, we reverse the ruling of the trial court and remand with directions to enter judgment with interest at the legal rate from November 12, 1982.

### C.

Finally, Anderson and Graham assert that the trial judge erred in directing a verdict for Citizens Bank on the Unfair Trade Practices cause of action. The Bank's practices in connection with Graham's application for a $900,000 loan, they argue, constitute unfair and deceptive acts and practices prohibited by Section 39-5-20(a), Code of Laws of South Carolina, 1976 as amended.

The State Board of Financial Institutions regulates the banking practices of Citizens Bank pursuant to Section 34-1-10 to -130, Code of Laws of South Carolina, 1976. The Board has extensive regulatory authority over banking practices, including the power to initiate criminal prosecutions against banks that violate a statute or regulation. Sections 34-1-60, 34-1-90, 34-1-100, Code of Laws of South Carolina, 1976. Therefore, under the "general activity" test of *State ex rel. McLeod v. Rhoades*, 275 S. C. 104, 267 S. E. (2d) 539 (1980), the actions of Citizens Bank in connection with the Graham loan are exempt from the provisions of the Unfair Trade Practices Act pursuant to Section 39-5-40(a), Code of Laws of South Carolina, 1976. *See NCNB Nat'l. Bank of North Carolina v. Tiller*, 814 F. (2d) 931 (4th Cir. 1987).[1] Accordingly, we affirm the ruling of the trial judge.

---

[1] *Cf.* 15 U.S.C. 57a(f)(1) (1985), which provides that unfair and deceptive practices by banks are regulated under rules of the Federal Reserve System, not under the Federal Trade Commission Act. *See also Fed. Trade Comm'n. v. Winters Nat'l. Bank & Trust, Co.*, 601 F. (2d) 395 (6th Cir. 1979). The South

For the reasons stated, the judgment of the circuit court is affirmed in part and reversed in part. We remand for entry of judgment in accordance with this opinion.

Affirmed in part, reversed in part and remanded.

SHAW and CURETON, JJ., concur.

## ORDER ON PETITION FOR REHEARING

Charles Dorn Smith, Jr., Bill Prince, and Carolyn S. Thompson and R. D. Thompson, Jr., as guardians ad litem for Robert D. Thompson, individually and d/b/a B. G. Farms, petition for a rehearing in this matter. They contend the Court failed to consider material facts or misapprehended the law relating to (1) the release executed by the parties on November 12, 1982, and (2) the award of prejudgment interest.

*The Release.* On appeal the B. G. Farms partners argued that the case should have been withdrawn from the jury because the release barred the action as a matter of law. We held there was evidence from which the jury could find the partners did not perform their part of the release agreement, i.e., they failed to make a valid tender to the Land Bank as the agreement obligated them to do. Consequently, they would not be entitled to enforce the release against Graham. See *Pearson v. Easterling*, 111 S. C. 124, 97 S. E. 238 (1918) (party to agreement must show performance before he can claim rights under it).

In their petition for rehearing, the partners claim our holding overlooks the fact that the release was executed and the attempt at payment made "at the request of Graham and in the manner requested by him." This "fact" appears to be a naked assertion by counsel. The record contains no testimony that the transaction on November 12, 1982, was done at Graham's request or in the manner requested by him. On the

Carolina Unfair Trade Practices Act states that the legislature intends the courts to be guided by federal interpretations of the Federal Trade Commission Act in construing Section 39-5-20(a). See Section 39-5-20(b), Code of Laws of South Carolina, 1976.

contrary, the evidence strongly suggests that the B. G. Farms partners had their own attorney draw the release, then induced Graham to sign it, then drove him to Sumter to offer a check to the Land Bank's attorney. For the reasons given in our opinion, the partners' purported offer of payment was not a good tender and thus did not constitute performance of the release agreement.

*Prejudgment Interest.* As an additional ground for rehearing, the partners suggest that in awarding prejudgment interest on the verdict of $234,000, we overlooked Anderson's claim that the amount due was $296,312.37. The partners urge that this difference between the amount claimed and the verdict shows the sum due was not certain for the purpose of computing interest.

The mere fact that the parties disagree over the amount of the debt does not make a claim unliquidated so as to preclude an award of prejudgment interest. *See Smith Construction Co., Inc. v. Wolman, Duberstein, and Thompson,* 294 S. C. 140, 363 S. E. (2d) 115 (1987). It is undisputed that when B. G. Farms took assignment of Thompson's lease, the partners assumed an obligation to pay the Land Bank or Graham $234,000 from the first proceeds of the 1982 crop. It is also undisputed that Prince gave Graham a postdated check for $234,000 to secure this payment. Obviously, $234,000 is a sum certain in money. The jury found the partners were liable by agreement to pay this amount. Therefore, a certain sum existed upon which to compute prejudgment interest.

The partners also assert there was no demand for prejudgment interest in the pleadings as required by *Town of Bennettsville v. Bledsoe,* 226 S. C. 214, 84 S. E. (2d) 554 (1954). This argument rests on a misapprehension of the law. The law allows prejudgment interest as a matter of course on an agreement to pay a sum certain. *Columbia Lumber & Mfg. Co. v. Globe Indemnity Co.,* 166 S. C. 408, 164 S. E. 916 (1932). Where the claimant is entitled to prejudgment interest as a matter of course, it is unnecessary to make demand for it in the pleadings. *Sims v. Goudelock,* 41 S.C.L. (7 Rich.) 9 (1853); *Kincaid v. Neall,* 14 S.C.L. (3 McC.) 81 (1825). Interest allowable as a matter of law may be requested by a post trial motion and nothing turns on the failure of the

claimant to demand interest in the complaint or to request a jury charge on his right to interest. *Flamm v. Noble*, 296 N. Y. 262, 72 N.E. (2d) 886 (1947). The *Bledsoe* case was not an action on a promise to pay a sum certain, but an action for restitution of an overpayment made by mistake. It is distinguishable on its facts.

We have considered all the points raised by Petition for Rehearing. We are unable to discover that any material fact or principle of law has been either overlooked or disregarded, and hence, there is no ground for a rehearing. It is therefore ordered that the petition be denied.