APAC–CAROLINA, INC., Plaintiff,

v.

TOWNS OF ALLENDALE AND FAIR-
FAX, SOUTH CAROLINA and Welco
Construction & Utilities Company, Inc.,
Defendants.

TOWNS OF ALLENDALE AND
FAIRFAX, SOUTH CAROLINA,
Third–Party Plaintiffs,

v.

CRS SIRRINE, INC., Third–
Party Defendant.

WELCO CONSTRUCTION & UTILITIES
CO., INC., Plaintiff,

v.

APAC–CAROLINA, INC., Defendant.

Civ. A. Nos. 4:90–1364–21, 4:90–1365–21.

United States District Court,
D. South Carolina,
Florence Division.

June 9, 1993.

Louie Franklin Elmore, Kimila L. Wooten, Greenville, SC, for APAC–Carolina, Inc., plaintiff/defendant.

Edwin Russell Jeter, Columbia, SC, for Towns of Allendale and Fairfax, defendants & third-party plaintiffs.

William Rhett Eleazer, Columbia, SC, for Welco Const. and Utilities, defendant/plaintiff.

Donald A. Harper, Norman Ward Lambert, Greenville, SC, for CRS Sirrine, Inc., third-party defendant.

### ORDER

TRAXLER, District Judge.

This case involves two lawsuits arising out of the construction of a sewage treatment facility for the towns of Allendale and Fairfax ("the Towns"). By agreement of the parties, both actions were consolidated procedurally, but not substantively, and were submitted to the court for non-jury trial. Pursuant to Fed.R.Civ.P. 52, this court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### The Parties

1. The Towns are the towns of Allendale and Fairfax, South Carolina. The sewage treatment system at issue in this case, known as Divisions II and III of the Allendale/Fairfax Wastewater Treatment Facilities (the "project"), was built to service the Towns.

2. In March 1982, CRS Sirrine, Inc. ("Sirrine") entered into an agreement with the Towns whereby Sirrine agreed to prepare and provide the Towns with detailed drawings, plans and specifications for the project. Moreover, Sirrine agreed to assist the Towns in obtaining government funding for the project.[1]

3. As part of its agreement with the Towns, Sirrine prepared the ground (or grade) profiles for the project. Sirrine warranted that these profiles were the result of an actual survey conducted by Sirrine, and depicted the correct ground elevation levels along the path where the sewer pipeline would be installed. In fact, the profiles were materially inaccurate.

4. APAC–Carolina, Inc. ("APAC") was the project's general contractor. In December 1984, APAC entered into a contract with the Towns to build the project for $1,044,912. In bidding on the project, APAC relied on the accuracy of the information contained in the plans and specifications provided to the Towns by Sirrine.

5. The contract between APAC and the Towns required the project to be constructed in strict accordance with the plans and specifications prepared by Sirrine. Specifically, the sewer pipeline was to be installed within .03 feet of the depth shown on the engineering profiles.

6. Sirrine acted as agent for the Towns for purposes of administering the Towns' contract with APAC.

7. Welco Construction and Utilities Company, Inc. ("Welco") was the subcontractor. In January 1985, Welco entered into a subcontract with APAC wherein Welco agreed to provide the labor and equipment necessary to install the sewer line and manholes for the project for $227,523. In return, APAC agreed to furnish the materials necessary for construction. In preparing its subcontract bid, Welco relied on the plans and specifications that the Towns provided to APAC, which were the plans and specifications prepared by Sirrine.

8. The subcontract between APAC and Welco provided that Welco agreed to be bound by the terms and conditions of the contract between APAC and the Towns.

### Problems Encountered During Construction

9. Welco commenced construction on the project's pipeline in January 1985. To a large degree, the sewer pipeline paralleled U.S. Highway 301 and was installed along the shoulder of the highway. Almost immediately, Welco discovered that the actual ground elevations along the highway's shoulder varied significantly from the elevation measurements found in Sirrine's ground profiles.

10. The uncontroverted testimony revealed that the ground profiles were inaccurate to such a degree that Welco essentially

---

1. The Towns obtained a substantial portion of the funds necessary for construction of the project from the Environmental Protection Agency ("EPA") and the Farmers Home Administration ("FmHA").

had to re-engineer the project in the field as the pipeline was being installed. The testimony revealed beyond a shadow of a doubt that the project could not have been constructed as designed.

11. Bobby Stone, executive vice-president of APAC at the time of the project's construction, testified that when he was assigned to the project in March 1985 the project was already behind schedule. Stone identified several reasons for the slowdown, all caused by the erroneous plans ultimately given to Welco. For brevity's sake, I will only mention a few of the problems: (1) *Extra Depth.* Welco was encountering substantially more depth than the profiles revealed. That is, Welco had to dig deeper than expected to install the pipeline in accordance with the plans. (2) *Excessive use of Backhoe.* The extra depth resulted in Welco's having to use a backhoe instead of a Cleveland Trencher [2] to dig most of the trench for the pipeline. As a consequence, Welco was unable to lay as much pipe per day as estimated. (3) *Hidden Obstructions.* The profiles failed to reveal several obstructions that Welco encountered, such as water lines. (4) *Extra Surveying.* Because of Welco's inability to rely on the ground profiles, the project had to be surveyed every 100 feet. The frequency of surveying was unusual for the type of pipeline that was being installed.

12. William E. Lawrence, Jr., vice-president of Welco, prepared Welco's estimate for the project. Lawrence testified that he relied 100% on the plans and specifications in preparing the estimate. Lawrence further testified that accurate plans and specifications are vital for determining how many feet of pipe per day can be installed. For example, Lawrence testified that after examining the plans and specifications, he estimated that Welco could install 3,000 feet of pipe per

day, and calculated Welco's bid for the project accordingly. However, the extra depth problem caused Welco to only install 700 to 800 feet of pipe per day on numerous occasions.

13. Lawrence's testimony completely corroborated Stone's testimony insofar as the problems associated with Sirrine's plans were concerned—extra depth, excessive use of backhoe, extra surveying, and so forth. Moreover, Lawrence added that Sirrine, in preparing the design documents, failed to take into account that the South Carolina Highway Department mandated a 12:1 shoulder slope requirement [3] for the installation of manholes. The highway department's encroachment permits would have shown the slope requirement; however, the encroachment permits were not included in the plans and specifications received by Welco. Further, Welco was not provided with a copy of the encroachment permits at the preconstruction conference. Lawrence testified that he was unaware of the encroachment permits until after construction of the project was underway.

14. The result of Welco's inability to rely on the grade profiles forced Welco to hire a civil engineer/land surveyor, Alex Tergeoglou, to re-engineer the project in the field on a daily basis. Tergeoglou also testified that the plans given to Welco were useless, and thus he had to re-survey the entire project. Tergeoglou's meticulous engineering notes unquestionably supported his testimony.

15. Moreover, two experts, L.G. Lewis and Robert George, both testified that in their opinion the project could not have been built as designed. Both experts proved clearly that Sirrine had simply copied a 1968 highway department ground profile map which showed the elevation along the center

---

**2.** A Cleveland Trencher is a trench digging machine which is vastly superior to the backhoe. Testimony indicated that the Cleveland Trencher runs constantly, and, as a result, can excavate at several times the speed of a backhoe. However, the daily log book of Tommy Moody, Sirrine's project inspector, showed that the Cleveland Trencher was used only three days on the project. The primary reason for the Cleveland Trencher's idleness stemmed from the fact that

the machine could not be used at depths encountered by Welco.

**3.** A 12:1 slope requirement means that the highway department required the placement of manholes at a 12 to 1 slope from the edge of the highway. For example, the elevation of a manhole placed 12 feet from the shoulder of a road must be one foot lower than the elevation at the road's shoulder.

line[4] of Highway 301, and used these elevation points as representing the actual ground elevation along the highway's shoulder.[5]

16. I find that the testimony of Lewis, standing alone, sufficiently established that the plans and specifications prepared by Sirrine were materially defective.

### Attempted Resolution

17. In an attempt to resolve the many problems with the project, Lawrence wrote a letter dated March 12, 1985, to Joseph C. Bambert, Jr., Sirrine's project manager.[6] This letter stated in pertinent part:

> This is to notify all concerned parties that on Friday, March 8, 1985 the above referenced project was temporarily shut down by verbal order issued by Tommy E. Moody, Inspector for CRS Sirrine due to the changes of grade elevations and other changes made by the highway department from the original plans and specifications. In view of these changes that have occurred, APAC feels that they should be compensated for additional costs and production loss incurred from the shut down and also a change order issued to justify the changes made from the plans and specifications differing from the scope of the work originally bid.

Lawrence also sent a copy of this letter to the Towns and Stone.

18. According to the uncontroverted testimony of Stone and Lawrence, on March 18, 1985, Stone, Lawrence, and Bambert met to discuss the problems associated with the project. At this meeting, Bambert, as the agent of the Towns and Sirrine, told Stone and Lawrence that he knew the plans and specifications were worthless. Nonetheless, Bambert told Stone and Lawrence to go ahead and complete the project and incur the obvious extra costs. According to Stone and Lawrence, Bambert stated that because of the paperwork involved, Welco should finish the project and then submit a final change order through APAC, instead of flooding the Towns and Sirrine with a constant stream of change orders. Specifically, this final change order would cover the additional labor, material, and equipment necessary to complete the project.

19. Stone, as the agent of APAC, authorized Welco to proceed and complete the project; agreed to compensate Welco for the additional labor and equipment; and agreed to process a change order for an equitable adjustment on behalf of Welco.

20. During construction of the project, APAC made advances to either Welco or creditors of Welco. Welco concedes that the advances totaled $110,000. (Mar. 26, 1993, Tr. at 26, lines 3–9 & at 27, lines 13–18.)[7]

21. Upon completion of the project in March 1986, Lawrence and Tergeoglou prepared "as-built" drawings of the project. The "as-built" drawings evidence the additional depths Welco was required to dig in order to lay the project's pipeline. Based upon the "as-built" drawings, Tergeoglou's engineering notes, and the daily logs prepared by Tommy Moody, Sirrine's project inspector, Lawrence determined the amount of additional labor, equipment, and surveying

---

4. The center line is a road's high point, and a road slopes downward the further one moves away from the center line. Thus, normally the elevation at a road's shoulder is lower than the elevation at the road's center line.

5. Specifically, Lewis testified that he conducted a station by station comparison of the highway department's center line profiles with Sirrine's shoulder profiles and found that over 90% of Sirrine's shoulder elevation points matched the highway department's center line elevation points. As for some of the elevation points that did not correspond, the non-conformity appears to be mere scrivener's error. For example, a highway department elevation point of 189.39' appeared as 189.93' on Sirrine's profiles.

6. Mr. Bambert died before the start of this trial and was not deposed before his death.

7. Welco contends that the $55,607 APAC received in June 1988 should be applied to offset the amount Welco owes APAC. ($110,000–$55,607). I disagree. The $55,607 represents the final retainage due APAC under the original contract plus approved change orders. In determining the amount of its out-of-pocket loss on the project, APAC included the $55,607 as part of the total contract-to-date amount. *See infra* note 8. Therefore, the $55,607 does not represent additional compensation received by APAC. Accordingly, to permit Welco to deduct $55,607 from the amount it owes APAC, allows Welco to count the $55,607 twice—as part of the original contract *and* as additional compensation.

required to install the pipeline. Moreover, Stone testified that he participated in calculating Welco's claim for additional compensation, and Charles Baldwin, APAC's accountant, testified that he verified the sums claimed by Welco for the extra work.

22. The amount arrived at by Lawrence and Stone and verified by Baldwin was $505,775. On this issue, Lawrence testified:

Q. All right. So what is the total amount that Welco is claiming that they are due as additional compensation?

A. The $505,775.52.

Q. Now you initially gave this figure to APAC, is that correct?

A. That's correct.

Q. And did they assist you in coming up with this figure?

A. Yes, they verified the numbers. Mr. Miller [APAC's attorney] was very strict in verifying everything I gave him. I even had to do drawings on air relief valves, manholes, and everything, all supportive documentation which has been verified through Mr. Baldwin and Mr. Stone.

Q. Did anybody at APAC ever tell [you] your figure was high, your figure was wrong, or did they tell [you] your figure was justified?

A. That was what all discussion was about, they felt like it was justified and they would go forth to collect it.

(Mar. 25, 1993, Tr. at 205, lines 1–17.)

23. By letter dated March 12, 1986, Lawrence submitted to Stone Welco's request for additional compensation. Lawrence's letter fully outlined the additional expenses incurred by Welco in completing the project. APAC adopted Welco's figures as fair and accurate and agreed to submit a change order for an equitable adjustment in order for Welco to receive compensation for the value of the work it performed over and beyond its original bid.

24. Thereafter, by letter dated May 1, 1987, William B. Miller, attorney for APAC, requested the Towns to issue a change order for an equitable adjustment in the amount of $505,775. The Towns rejected the claim.

25. In late 1987, following the Towns rejection of APAC's original claim for an equitable adjustment, APAC and Welco attempted to execute a sponsorship agreement whereby both parties would jointly attempt to obtain additional compensation from the Towns. APAC proposed a sponsorship agreement whereby it was to receive the first $280,823 recoverable from the Towns. This amount would compensate APAC for, among other things, advances made on Welco's behalf. Any proceeds recoverable from the Towns in excess of $280,823 were to be prorated among APAC and Welco. The parties, however, never executed the agreement because they could not agree on the amount of APAC's first entitlement to the proceeds. Welco (Lawrence) believed that APAC's losses were substantially smaller than $280,823.

26. Lawrence testified that Welco personnel, along with an APAC employee, audited APAC's books in 1987 to ascertain APAC's loss on the project. The results of this joint Welco/APAC venture showed that APAC had suffered an out-of-pocket loss of only $48,903,[8] and a total loss of $101,792 ($48,903 plus lost profit of $52,889). Not surprisingly, Welco refused to execute a sponsorship agreement which guaranteed APAC the first $280,823 recoverable from the Towns.

27. In response to Welco's findings regarding APAC's loss, James Peterson, Welco's attorney at the time, wrote Miller concerning the sponsorship agreement. This letter, dated December 2, 1987, stated in relevant part as follows:

Last spring Kathy White from the Darlington office of APAC came over with the documentation from the Allendale job, and she and personnel from Welco reviewed it in an effort to determine the amount of the loss on this job. Those efforts resulted in the calculation of a figure of $101,792.82. This was the result of many hours of work. Despite this, however, when the agreement

8. Specifically, Lawrence testified that the audit disclosed that APAC had expended $1,106,682.84 on the project. This figure was comprised of invoices of $825,529.36 plus payroll, taxes, and advances of $281,153.48. The total contract (original bid plus approved change orders) was $1,057,778.97. The difference is $48,903.87.

was presented to Welco for signature several weeks ago, the figure inserted for the loss incurred by APAC was well in excess of $200,000.00.

28. Later, the parties signed a sponsorship agreement under which APAC would receive the first $110,000 instead of $280,823. This agreement, however, was later rescinded.[9]

29. Notwithstanding its oral agreement to compensate Welco for the additional work performed, and its oral agreement to pursue a change order for an equitable adjustment on behalf of Welco, APAC failed to pay Welco for the value of the work performed.

### Final Payment

30. The contract between APAC and the Towns provided that APAC's acceptance of final payment operated as a release of all claims that APAC may have for additional compensation from the Towns.

31. Specifically, the contract between the Towns and APAC contained both general and special conditions, with the special conditions taking precedence over the general conditions. Special Conditions Article No. 23 of the APAC/Towns contract ("special condition 23") explains the effect of APAC's acceptance of final payment:

*ACCEPTANCE OF FINAL PAYMENT AS RELEASE*

**The acceptance by the Contractor of final payment shall be and shall operate as a release** to the Owner of all claims and all liability to the Contractor for all things done or furnished in connection with this work and for every act and neglect of the Owner and others relating to or arising out of this work. . . . (emphasis added).

32. As mentioned before, EPA and FmHA provided the bulk of the funding for the project. Accordingly, both entities supplemented the APAC/Towns contract with their own conditions. FmHA general condi-

tion 20 ("general condition 20") is essentially the same as special condition 23:

FmHA General Conditions

20. ACCEPTANCE OF FINAL PAYMENT AS RELEASE

20.1 **The acceptance by the CONTRACTOR of final payment shall be and shall operate as a release** to the OWNER of all claims and all liability to the CONTRACTOR other than claims in stated amounts as may be specifically excepted by the CONTRACTOR for all things done or furnished in connection with this WORK and for every act and neglect of the OWNER and others relating to or arising out of this WORK. . . . (emphasis added).

33. Both Stone and Lawrence testified that all parties were aware of the significance of the acceptance of final payment. In particular, Lawrence testified as follows:

Q. So the whole issue of final payment was recognized to be a significant issue a year prior to June, 1988, correct?

A. That's correct.

Q. And there was a commitment on the part of APAC they would not accept final payment checks until they had arbitrated or litigated [Welco's] claim, correct?

A. That is correct.

Q. And the reason that it was important that they not accept final payment was that everyone understood that meant you were releasing all claims, correct?

A. That's correct.

(Tr. at 330, lines 9–19.)

34. The EPA special conditions specifically stated that they superseded any conflicting provisions of the APAC/Towns contract. The EPA special conditions, however, did not address the *effect* of final payment. EPA special condition 14 (the "EPA condition") discusses the *obligations of the contractor* prior to final payment:

14. Final Payment

---

9. The rescinded sponsorship agreement was introduced into evidence as Welco Exhibit 2. (Tr. at 239, line 3.) APAC objected to the introduction of the agreement in a limited sense. Because the agreement was rescinded, APAC objected to its use as evidence of any breach of such agreement. (Tr. at 238, lines 21–25.) This

court considers the agreement relevant solely to the issue of damages, to which there was no objection. (Tr. at 662, lines 22–23.) Damages in this case can be, and are, established without consideration of the terms of the rescinded sponsorship agreement.

Upon satisfactory completion of the work performed under this agreement, as a condition before final payment ... the contractor shall execute and deliver to the owner a release of all claims against the owner arising under or by virtue of this agreement, except claims which are specifically exempted by the contractor to be set forth therein....

35. The project was completed in the spring of 1986. In early January 1987, Bambert, Sirrine's project manager, wrote Stone and informed him that the Towns, EPA, and FmHA were ready to close out the project. Moreover, the letter informed APAC that the Towns were in the process of forwarding all necessary documentation to the EPA:

S.C.DHEC(EPA) advised our office to process the pay request and change order after giving your office a *notice* and a *deadline.* The above items will be forwarded to the proper agencies on January 9, 1987 if we have not received from your office a written letter stating reasons not to file the pay request and change order.

36. In response to Bambert's letter, Miller, APAC's corporate counsel, wrote Bambert informing him that APAC would be seeking additional compensation for the project.

37. Over the ensuing 18 months, APAC and the Towns engaged in numerous settlement discussions regarding the claim for additional compensation. The Towns consistently and repeatedly rejected every claim of APAC. For example, in May 1987, APAC sent the Towns a detailed request for an equitable adjustment in the amount of $505,775. Within two weeks (May 14, 1987), Bruce McGougan, Allendale's town clerk, wrote Miller [10] informing him that the Towns were rejecting APAC's claim on numerous grounds, including the following:

Specific justification will be required as to the reasons these matters were not brought up during the construction as required by the contract documents. Also justification will be required as to why an

additional claim is being requested approximately two years after substantial completion of the project.

38. Numerous unsuccessful settlement discussions continued through May 1988. The parties were at an impasse. APAC still contended it was owed additional sums, while the Towns remained staunchly opposed to paying any amounts above the contract price plus approved change orders. By letter dated June 20, 1988, the Towns, once again, rejected APAC's claim:

Dear Mr. Miller:

Reference [the project] and our meeting of May 18, 1988. We have looked at all aspects of the APAC claim for additional compensation for the stated Project.

We reviewed the records of the events of October 1987 at which time representives of APAC, Welco, Allendale, and CRS Sirrine Inc. met on site to take sample measurements of the depths of the actual construction as compared to the plan depths. We also considered the points you addressed in our most recent telephone calls.

Attached is summary of the situation as we see it. **It appears that APAC is not entitled to further compensation for this Project.**

Sincerely

Bruce McGougan

Town Clerk

(mistake in original & emphasis added). McGougan testified that this letter was intended to notify APAC that the Towns considered the issue of additional compensation finally resolved. Moreover, Stone testified that he received a copy of McGougan's letter within days of its mailing.

39. On June 22, 1988, the Towns mailed four checks to APAC's Darlington, South Carolina office.[11] The sum of the four checks was $55,607. This figure represented the balance due under the original contract between APAC and the Towns plus approved change orders. Three of the checks were marked "final payment" and one was desig-

---

10. McGougan testified that "for all intents and purposes," he dealt with Miller with regards to APAC's claim for additional compensation. (Tr. at 544, lines 14–16.)

11. Throughout the project, all checks were mailed to APAC's Darlington office.

nated "final pay estimate." APAC deposited the checks in a routine manner without taking exception to the amounts or reserving any rights for additional compensation.

40. Accompanying the final payment checks was a letter which clearly stated that the enclosed checks constituted final payment under the APAC/Towns contract:

> Please find enclosed 4 checks in the amount of $8934.44, $22,926.87, $18,778.94, and $4967.49 for a total amount of $55,-607.74. This represents the final amount due from the Town of Allendale and Town of Fairfax for Div II & III. If you have any questions please feel free to give me a call.

41. Charles Baldwin, Division Controller for APAC, South Carolina Division since 1981, testified that his responsibilities include all of APAC's accounting functions. Baldwin testified that he knew in June 1988 that APAC had received $55,607 in connection with the project. He further testified that he informed Stone of the checks around the same time. Stone himself testified that he saw the cover letter for the final payment checks, but could not remember when he saw it. In any event, APAC admitted in closing argument that it had knowledge of the final payment checks by August 1988.

42. In November 1988, approximately five months after the Towns mailed APAC the final payment checks, EPA funding for the project was closed out.

43. APAC deposited the final payment checks without exception or reservation. For approximately seven months, APAC was silent. Stone testified that he was unaware of any correspondence between APAC and the Towns between June 1988 and January

1989. Accordingly, the Towns considered the matter finally resolved. However, in January 1989, APAC mailed the Towns a draft demand for arbitration.[12] Although the letter threatened arbitration if the Towns refused to pay additional monies, the demand for arbitration was not actually filed until *after* Welco sued APAC in May 1989.[13]

### APAC's Purported Damages

44. Baldwin testified that APAC, in completing the project, incurred $317,468 in direct and indirect costs increases. Baldwin testified that APAC's expenditures on the project were tracked by assigning cost codes to various items used on the project. He testified that the cost codes were the key to the accounting system. Moreover, Baldwin testified that he assumed that either Stone or Lawrence, the men most familiar with the actual construction of the project, assigned the cost codes to the various invoices. However, both Stone and Lawrence testified that neither assigned the cost codes. In fact, APAC now admits it has no idea who assigned the cost codes on the project. Further, Baldwin admitted that he could not verify the accuracy or reliability of the information contained on the cost codes.

45. I find that Baldwin's testimony unquestionably showed that APAC's damage calculations were speculative at best. APAC's damage figures constantly changed throughout the trial. *See supra* note 12. Time and time again, Baldwin's testimony clearly indicated that numerous damage items were not properly attributable to the Towns or coded properly. The following testimony of Baldwin is illustrative on this last point:

12. Specifically, APAC's draft demand for arbitration sought $600,000 in additional compensation. However, APAC initially sought an equitable adjustment of $505,775. Additionally, although the project was completed in 1986, APAC revised its damages figures again before trial *and* also during trial. Currently, APAC asserts that its damages are $317,648 (recoverable from Towns) and $352,154 (recoverable from Welco) respectively.

13. The procedural posture of this case is most unusual. In May 1989, Welco, the sub-contractor, sued APAC, the general contractor. Thirteen

days later, APAC filed a demand for arbitration against the Towns and thereafter filed suit against the Towns. Welco then filed for bankruptcy protection under chapter 11 of the bankruptcy code. In November 1990, APAC filed an amended complaint alleging causes of action against both the Towns and Welco. Basically, APAC contends that either the Towns owe APAC for additional compensation or Welco owes it for overcharges and advances. In other words, APAC is *not* seeking any monies from the Towns on behalf of Welco.

Q. You just didn't have anyplace to put asphalt in your cost code system?

A. That's correct. Well, there are charges in there for asphalt under the paving and patching item.

Q. That's right. But you didn't put these asphalt charges under those items, did you?

A. No sir, we did not.

Q. You put them under what item?

A. Item 510.

Q. What item is 510, equipment repairs?

A. Equipment repairs.

Q. You're putting that asphalt in equipment repairs?

A. Yes, sir.

Q. It is equipment repair or not?

A. No sir, it is not equipment repair.

(Tr. at 685, lines 8–22.)

46. APAC contends its claim is a modified total cost claim. I disagree. APAC's damage computations are more accurately characterized as a lumping together of all conceivable costs attributable to the project coupled with a challenge to the Towns to prove which items should be deducted.

## CONCLUSIONS OF LAW

### Welco v. APAC

 1. Under South Carolina law, "if a party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purpose in view." *Hill v. Polar Pantries*, 219 S.C. 263, 271, 64 S.E.2d 885, 888 (1951). APAC furnished Welco with the plans and specifications for construction of the project. As such, APAC impliedly warranted that the plans and specifications were accurate, reliable, and suitable for construction of the project. The undisputed testimony revealed that the plans were materially inaccurate. The plans were so defective that the project could not be built as designed. Accordingly, APAC breached its implied warranty to provide Welco with accurate, reliable, and suitable plans.

 2. To recover for APAC's breach of implied warranty, Welco must show that its loss resulted from the breach. *Hutson v. Cummins Carolinas, Inc.*, 280 S.C. 552, 314 S.E.2d 19, 23 (Ct.App.1984). The uncontroverted testimony of Stone, Lawrence, and Tergeoglou unquestionably showed that the erroneous plans and specifications caused Welco to, *inter alia*, (1) underestimate its bid on the project; (2) use a backhoe instead of a Cleveland Trencher to dig the trench; and (3) hire an engineer/surveyor to re-engineer the project in the field. Thus, it is clear that Welco's damages were a direct result of APAC's breach of its implied warranty to provide Welco with accurate plans.

 3. Moreover, APAC may not avoid liability for its breach of implied warranty on the grounds that it was unaware that the plans and specifications it provided to Welco were defective. *Magill v. Gulf & Western Indus.*, 736 F.2d 976, 979 (4th Cir.1984) ("if a material state of facts is warranted to exist and it turns out not to be the case, the warrantor is liable even though he acted on misinformation or in good faith.").[14]

 4. A written agreement may be orally modified so long as the modification is supported by consideration. *Evatt v. Campbell*, 234 S.C. 1, 106 S.E.2d 447, 449–51 (1959). The testimony of Stone and Lawrence revealed that on March 18, 1985, both men met with Bambert and discussed the numerous problems associated with the project (the week before this meeting the project was temporarily halted). At this meeting, Bambert, as agent for the Towns, authorized APAC and Welco to: (1) complete the project; (2) incur the extra costs; and (3) submit a final change order for additional compensation upon completion of the project. In so doing, Bambert orally modified the contract between the Towns and APAC. The consideration for this modification was APAC and Welco's promise to expend the additional time, labor, material, and equipment necessary to finish the project.

---

**14.** The quoted passage from *Magill* is a discussion of New York contract law; however, the court is unaware of any South Carolina case which holds to the contrary.

5. Stone, as agent of APAC, orally modified the contract between APAC and Welco. APAC agreed to compensate Welco for the additional labor and equipment expended by Welco in order to complete the project. Moreover, APAC agreed to obtain a change order for an equitable adjustment on behalf of Welco. This modification was supported by consideration in the form of Welco's additional work performed, and expenses incurred, in finishing the project. Accordingly, the court concludes that the oral modification of the written contract between Welco and APAC is binding on the parties. *Evatt,* 106 S.E.2d at 449–51; *FDIC v. Waldron,* 630 F.2d 239, 241 (4th Cir.1980).

6. Welco and APAC agreed to be bound by the terms and conditions contained in the contract between APAC and the Towns. Although the APAC–Towns contract proscribed oral modification of the written agreement, this provision does not invalidate, as here, an otherwise binding oral modification. "Written contracts, however, may be orally modified by the parties, even if, as here, the writing itself prohibits oral modification." *SCNB v. Silks,* 295 S.C. 107, 109, 367 S.E.2d 421 (Ct.App.1988). As stated more fully in *Lazer Constr. Co. v. Long,* 296 S.C. 127, 370 S.E.2d 900 (Ct.App.1988):

> Moreover, a written contract may be modified by oral agreement even when it explicitly states all changes must be in writing. This rule has been applied to building and construction contracts. Under this rule, [plaintiff's] failure to execute change orders for additional work did not necessarily preclude recovery if it could show [defendant] approved the changes.

*Id.,* 370 S.E.2d at 902 (citations omitted).

7. It is an axiom of black letter law that "[a] person performing extra services or incurring additional expenses as a result of a modification of a contract is entitled to receive compensation therefor." 17A C.J.S. *Contracts* § 365, at 369 (1963). Welco incurred substantial additional expenses in completing the project. APAC, however, refused to compensate Welco for the additional work. Therefore, this court concludes that APAC breached its oral contract with Welco.

8. Welco is entitled to recover its damages resulting from APAC's breach of contract and breach of implied warranty.

9. Although APAC and Welco agreed that the latter would receive additional compensation, there was no agreement as to the amount of compensation Welco would receive for the extra work. "[W]hen the contract is silent as to the price to be paid, the law invokes the standard of reasonableness, and the fair value of the services is recoverable." *Gantt v. Morgan,* 199 S.C. 138, 141, 18 S.E.2d 672 (1942); *Braswell v. Heart of Spartanburg Motel,* 251 S.C. 14, 159 S.E.2d 848, 850 (1968). Thus, Welco may recover the fair value of the services it rendered in completing the project which went beyond the scope of its original bid.

10. Lawrence calculated Welco's claim for additional compensation based upon the "as-built" drawings of the project, Tergeoglou's engineering notes, and Moody's daily log book. APAC employee Stone participated in forming the claim, and APAC employee Baldwin verified the sums claimed for additional compensation. Accordingly, the fair value of the services rendered is $505,775—the figure arrived at by Welco and adopted as fair and accurate by APAC. *Gantt,* 199 S.C. at 141, 18 S.E.2d 672. Further evidence that $505,775 is the fair value of the services rendered stems from the fact that in May 1987, APAC submitted to the Towns a claim for an equitable adjustment in the amount of $505,775.

11. As mentioned above, $505,775 represents the fair value of the services rendered by Welco that are above and beyond its original bid. Welco, however, admits receiving $110,000 in advances from APAC to cover additional expenses, and therefore asks that this amount be deducted from its claim. Accordingly, this court concludes that the fair value of the services recoverable by Welco is $395,775 ($505,775–$110,000), plus prejudgment interest.

12. An award of prejudgment interest rests within the sound discretion of the district court. *Maksymchuk v. Frank,* 987 F.2d 1072, 1077 (4th Cir.1993); *United States v. Gregory,* 818 F.2d 1114, 1118 (4th

Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). Given the facts of this case, I find that Welco is entitled to prejudgment interest.

13. On March 12, 1986, Lawrence, on Welco's behalf, submitted to APAC its request for additional compensation. This letter, addressed to Stone, contains a detailed description of the extra work incurred by Welco to complete the project. Moreover, the letter demands payment for the extra work. As such, Welco is entitled to prejudgment interest:

> The law allows prejudgment interest on obligations to pay money from the time when, either by agreement or operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty, even if the parties do not agree on the amount of the obligation.

*Brooklyn Bridge, Inc. v. South Carolina Ins.,* 309 S.C. 141, 420 S.E.2d 511, 513 (Ct. App.1992); *Anderson v. Citizens Bank,* 294 S.C. 387, 365 S.E.2d 26, 32 (Ct.App.1987), *overruled on other grounds, Ward v. Dick Dyer and Assocs., Inc.,* 304 S.C. 152, 403 S.E.2d 310 (1991); *Wayne Smith Constr. v. Wolman, Duberstein, and Thompson,* 294 S.C. 140, 363 S.E.2d 115, 119 (Ct.App.1987). Accordingly, Welco is entitled to prejudgment interest from March 12, 1986 until the date judgment is entered in this case.

14. In diversity cases, "state law governs the prejudgment interest rate." *Loft v. Lapidus,* 936 F.2d 633, 639 (1st Cir. 1991); *McDermott v. Middle East Carpet Co.,* 811 F.2d 1422, 1429 (11th Cir.1987); *West v. Harris,* 573 F.2d 873, 884 (5th Cir. 1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979). In South Carolina, prejudgment interest is calculated at a rate of 8.75% per annum:

> In all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum.

15. As a matter of fact, APAC did not attempt to repudiate the retention of the money as final

S.C.Code Ann. § 34–31–20(A) (Law.Co-op.1976). Therefore, Welco is entitled to prejudgment interest at the legal rate of 8.75% per annum.

### APAC v. Towns

15. "The validity of a clause providing for release upon final payment is well-established." *Mon–Rite Constr. v. Northeast Ohio Regional Sewer Dist.,* 20 Ohio App.3d 255, 20 OBR 317, 485 N.E.2d 799, 802 (1984); *McKeny Constr. v. Town of Rowlesburg,* 187 W.Va. 521, 420 S.E.2d 281, 285 (1992). The contract between APAC and the Towns unmistakably provided that APAC's acceptance of final payment operated as a release of all claims APAC may have against the Towns. Moreover, all parties were cognizant of this fact. Accordingly, this court finds the final payment provisions of the APAC/Towns contract valid and enforceable.

16. In June 1988, the Towns notified APAC they had reviewed APAC's claim for additional compensation and had concluded that APAC was not entitled to additional monies. Thereafter, the Towns mailed four checks to APAC, three of which were designated "final payment" and one marked "final pay estimate," along with a letter that stated the checks represented the "final amount due" under the contract. APAC accepted the checks without reserving any right for additional compensation. Moreover, APAC deposited the checks and remained silent until January 1989, despite the fact that Miller, Stone, and Baldwin all learned of the final payment checks by August 1988, if not sooner. I find that APAC's negotiation of the final payments checks, coupled with its silence for the ensuing seven months, constituted acceptance of final payment under the contract.[15] As a result, APAC released the Towns of all claims for additional compensation. *Mon–Rite,* 485 N.E.2d at 802; *McKeny,* 420 S.E.2d at 285.

17. APAC contends that because it presented its claim for additional compensation before receiving the final payment checks, it was not required to present another claim for

payment until after this lawsuit was brought.

additional compensation after accepting the checks. I disagree. "[T]he presentation of a claim prior to acceptance of final payment does not alter the effect of a final payment provision." *Mon–Rite*, 485 N.E.2d at 802.

18. This court is aware that under South Carolina law mere acceptance of a check marked "final payment" does not release a debtor from the obligation to fully repay his creditor. *Tremont Constr. Co. v. Dunlap*, —— S.C. ——, 425 S.E.2d 792, 794 (Ct.App.1992) ("Accepting a check that bears the words 'final payment' or similar phrases, does not constitute an accord and satisfaction as a matter of law."). However, this court does not base its decision regarding final payment on APAC's mere acceptance of the final payment checks. Rather, APAC's conduct following acceptance of the final payment checks, specifically its complete silence for several months, unquestionably evidenced an intent to release all claims for additional compensation.[16]

19. Additionally, even if this court were to rule that APAC did not intend to release the Towns from its claim for additional compensation, I would hold that APAC waived its right to seek additional compensation. "A waiver is an intentional relinquishment of a known right." *Lyles v. BMI, Inc.*, 292 S.C. 153, 158, 355 S.E.2d 282 (Ct.App. 1987). Without question APAC knew the effect of acceptance of final payment. Additionally, APAC knew the final payment checks were sent by August 1988, yet did nothing for four months. Accordingly, I would find that APAC's acquiescence constituted an "intentional relinquishment of a known right." *Id.*

20. This court finds no merit to APAC's argument that there was no final payment because the Towns failed to obtain a release as required by the EPA condition. The EPA condition does not address the effect of final payment. Instead, it addresses the obligations of the contractor and places no duties upon the owner. Therefore, the EPA condition is not applicable to, nor in conflict with, special condition 23 and general condition 20, both of which unambiguously state that the acceptance of final payment operates as a release of all claims. *See Mon–Rite*, 485 N.E.2d at 802–803 (rejecting similar argument that EPA supplemental provision nullifies final payment clause). Moreover, it is difficult to comprehend how the Towns failed to comply with an EPA condition that is obviously, and exclusively, directed towards the conduct of APAC.

21. Further, the EPA condition states that upon completion of the project, the contractor *shall* execute and deliver to the owner a release of all claims except those claims specifically exempted in such release. Accordingly, the EPA condition provides a mechanism for preserving claims. In this case, APAC merely had to execute a release of all claims while specifically exempting its right to seek additional compensation. APAC failed to do so. Accordingly, APAC, and not the Towns, breached the EPA condition.

22. Additionally, APAC's construction of the EPA condition allows a contractor to unilaterally keep open an EPA contract indefinitely by refusing to execute a release of claims. This court refuses to adopt such an interpretation.[17] The EPA condition benefits the owner, not the contractor—the con-

---

**16.** Although *Tremont Constr.* is an accord and satisfaction case, it supports the "final payment" defense of the Towns. To argue that the checks operated as either "final payment" or an "accord and satisfaction" requires the same showing—that APAC accepted the checks with the intention of releasing its claim for additional compensation. *Ford Motor Credit Co. v. Morales*, 279 S.C. 388, 308 S.E.2d 102 (1983) ("A payment of a debt is not considered made until it is accepted by the creditor with the intention of extinguishing the debt."); *Tremont Constr.*, 425 S.E.2d at 793 ("the creditor must accept payment with the intention that it shall operate as a satisfaction."). As previously discussed, APAC's acceptance of the final payment checks and subsequent silence evidenced an intent to release the Towns for all claims.

**17.** APAC's interpretation of the EPA condition nullifies the final payment clauses of the contract. However, the EPA condition and the final payment conditions must be interpreted, if reasonable, in a manner which gives effect to all three provisions. *Mon–Rite*, 485 N.E.2d at 802 (contract provision should not be disregarded simply because it is inconsistent with other provisions "unless no other reasonable construction is possible").

tractor's execution of a release protects the owner from future liability arising out of the contract.

█ 23. Finally, even if I were to accept APAC's interpretation of the EPA condition, I would find that APAC waived compliance with the EPA condition by knowingly accepting final payment without reservation.

**THEREFORE, IT IS ORDERED** that Welco is granted judgment against APAC in the amount of $395,775.

**IT IS FURTHER ORDERED** that Welco is entitled to prejudgment interest from APAC at the rate of 8.75% per annum commencing on March 12, 1986.

**IT IS FURTHER ORDERED** the judgment shall be entered for the Towns.

**IT IS SO ORDERED.**

### ALTERNATIVE CONCLUSIONS OF LAW (APAC v. TOWNS)

Out of an abundance of precaution, this court enters the following alternative conclusions of law regarding APAC's claim for additional compensation:[18]

1. In supplying APAC with the drawings, plans, and specifications for the project, the Towns impliedly warranted that this information was accurate, reliable, and suitable for construction of the project. *Polar Pantries*, 64 S.E.2d at 888. As discussed above, the plans were virtually useless. Accordingly, the Towns breached its implied warranty to supply APAC with accurate, reliable, and suitable plans.

2. The Towns' breach of implied warranty resulted in APAC's expenditure of additional sums to construct the project, and APAC is entitled to recover these additional costs as damages. *Hutson*, 314 S.E.2d at 23.

3. South Carolina recognizes the tort of negligent misrepresentation. *Gilliland v. Elmwood Properties*, 301 S.C. 295, 391 S.E.2d 577 (1990). "A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction. The recovery of damages may be predicated upon a negligently made false statement where a party suffers either injury or loss as a consequence of relying upon the misrepresentation." *Id.*, 391 S.E.2d at 580 (quoting *Winburn v. Insurance Co. of North America*, 287 S.C. 435, 339 S.E.2d 142, 146 (Ct.App.1985)). In short, a defendant is liable for negligent misrepresentation "where the misrepresented fact(s) induced the plaintiff to enter a contract or business transaction." *Gilliland*, 391 S.E.2d at 580.

4. Obviously, the Towns had a pecuniary interest, and thus a concomitant duty to exercise reasonable care in providing information to APAC.

5. Although APAC entered into a contract with the Towns, Sirrine acted as the Towns' agent for purposes of administering the APAC–Towns contract. Consequently, Sirrine owed APAC a duty to use due care in providing the latter with accurate information. *Winburn*, 339 S.E.2d at 147. Sirrine, as agent for the Towns, breached this duty.

6. At a minimum, Sirrine was negligent in its use of the highway department's drawings to prepare the project's grade profiles. Moreover, Sirrine falsely, or at least recklessly, represented that these grade profiles were accurate and the result of an actual survey. As such, the plans and specifications constituted negligently made false statements. Unquestionably, APAC suffered damages as a result of relying on the misrepresentations contained in the inaccurate plans and specifications. Therefore, APAC's damages are the result of Sirrine's negligent misrepresentations. *Gilliland*, 391 S.E.2d at 580.

7. As stated before, Sirrine was the agent of the Towns for purposes of the project. Under South Carolina law, "a principal is liable to third persons for the frauds, deceits, concealments, misrepresentations, negligences and other malfeasances and omissions of duty of his agent acting within the scope of his agency, although the principal did not authorize, participate in, or know of such misconduct." *State ex rel. McLeod v. C & L Corp.*, 280 S.C. 519, 313 S.E.2d 334, 339–40

---

18. If a higher court were to disagree with the conclusion of this court that the knowing acceptance and silent retention of the four checks constituted final payment, then the damages suffered by APAC would become relevant in its case against the Towns.

(Ct.App.1984). Accordingly, the Towns are liable to APAC for Sirrine's negligent misrepresentations.

8. Sirrine's project manager, Bambert, acting as agent of the Towns, authorized APAC to complete the project and assume the accompanying additional costs. Moreover, Bambert told APAC to refrain from submitting change orders for the extra work until the end of the project. In completing the project, APAC relied on Bambert's assurances of additional compensation. Upon the project's completion, however, the Towns rejected APAC's requests for additional compensation. Accordingly, Bambert's representations regarding the final change order constituted a negligent misrepresentation. *Gilliland,* 391 S.E.2d at 580. The Towns, of course, are liable for the torts of its agent acting within the scope of his agency. *State ex rel. McLeod,* 313 S.E.2d at 339–40.

9. Although the contract between APAC and the Towns prohibited oral modification of the contract, this provision does not bar APAC from proceeding on its negligent misrepresentation claims. *See Gilliland,* 391 S.E.2d at 581 (holding "that neither the parol evidence rule nor the merger or integration clause in the parties' contract prevents [defendant] from proceeding on its negligent misrepresentation [counterclaim].").

10. Accordingly, APAC's damages are the direct and proximate result of Sirrine's breach of implied warranty and negligent misrepresentations. Moreover, APAC shall recover its damages from Sirrine's principal, the Towns.

11. The court cannot accept the damage figures offered at trial by APAC. Baldwin's testimony unquestionably established that APAC's damage figures were speculative. Additionally, the numbers constantly fluctuated. Therefore, APAC failed to carry its burden of proving its damages to a reasonable certainty. *Collins Music Co. v. Ingram,* 292 S.C. 537, 539–40, 357 S.E.2d 484 (Ct.App. 1987); *see Sterling Development Co. v. Collins,* 309 S.C. 237, 421 S.E.2d 402, 405 (1992) ("In claiming lost profits, the degree of proof required is that of reasonable certainty."); *Jackson v. Midlands Human Resources Center,* 296 S.C. 526, 582, 374 S.E.2d 505 (Ct. App.1988) (same rule for special damages).

12. APAC suffered damages of $101,792. The court finds this figure, arrived at by Welco and APAC personnel with extensive knowledge of the project, to be a much better indicator of APAC's true damages. More precisely, this damage figure was: (1) computed in 1987, shortly after completion of the project; (2) the product of a joint APAC/Welco venture; and (3) computed after an examination of both Welco's purchase orders and APAC's accounting records. (Tr. at 360, line 1 to 363, line 23.) The out-of-pocket loss figure of only $48,903, helps explain APAC's utter lack of interest in pursuing its claims for additional compensation after receiving the final payment checks totalling $55,607.

13. Given the magnitude of the project, APAC's loss was relatively inconsequential. With such a relatively small loss, it was reasonable for APAC to accept the final payment and forego suit on the remainder. In other words, APAC, no doubt, reasoned that any attempt to collect additional monies would not be worth (as had been demonstrated) the expense.

14. Although an award of prejudgment interest rests within this court's discretion, *Maksymchuk,* 987 F.2d at 1077, APAC's demonstrated inability to reduce its claim to a sum certain precludes such an award. *Brooklyn Bridge,* 420 S.E.2d at 513.