Lawrence D. MANSER, Plaintiff,

v.

MISSOURI FARMERS ASSOCIATION,
INC., Defendant.

No. 84–0014–CV–W–9.

United States District Court,
W.D. Missouri, W.D.

Dec. 24, 1986.

H. Lynn Henry, Henry, Henry & Henry, West Plains, Mo., Michael J. Gallagher, Thomas M. Franklin, Wassberg, Gallagher & Jones, Kansas City, Mo., for plaintiff.

Wayne H. Hoecker, James L. Moeller, Gage & Tucker, Kansas City, Mo., for defendant.

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT I, GRANTING DEFENDANT'S MOTION TO DISMISS COUNT III, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT IV

BARTLETT, District Judge.

Plaintiff Lawrence D. Manser was employed by defendant Missouri Farmers Association as the manager of an exchange operated by defendant in LaPlata, Missouri, from August 1974, until his discharge on January 28, 1982. After his discharge, plaintiff filed the complaint in this case alleging violations of rights protected by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.* Plaintiff then filed first and second amended complaints adding three state law claims. Defendant now seeks dismissal of Counts I, III and IV of the second amended complaint.

### 1.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND III BASED ON COLLATERAL ESTOPPEL

Defendant has moved for summary judgment on Counts I and III based on the doctrine of collateral estoppel. Because Count III will be dismissed on other grounds, *see* section 3 of this Order, the Court will not address that count in this section.

#### a. *Standard for Summary Judgment*

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the Court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 728–28 (8th Cir.1979), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). However, summary judgment is an extreme remedy which should not be granted, unless the moving party has established his right to judgment beyond controversy. *Ozark Milling Co., Inc. v. Allied Mills, Inc.*, 480 F.2d 1014, 1015 (8th Cir.1973); *Oskey Gasoline and Oil Co., Inc. v. Continental Oil Co.*, 534 F.2d 1281, 1285 n. 9 (8th Cir.1976).

### b. *Collateral Estoppel and Count I*

Plaintiff alleges in Count I that defendant violated § 510 of ERISA, 29 U.S.C. § 1140, by demoting and discharging plaintiff in order to prevent him from receiving expense benefits, long term disability benefits and long term sick leave.

> Section 510 of ERISA provides in part: It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140. Defendant does not dispute that when plaintiff was employed he was covered by defendant's benefit plans and that these plans are employee benefit plans as defined under ERISA, 29 U.S.C. § 1002(1) and (3).

Defendant argues that plaintiff should be estopped from bringing this claim because a deputy in the Missouri Division of Employment Security determined that plaintiff was not eligible to receive unemployment compensation benefits after his discharge. The deputy stated: "Claimant was discharged due to an audit conducted that exposed several company violations. Claimant had been warned 9–16–81 concerning problems in accounts receivable and charge tickets. Claimant admitted that charge tickets were sent in late and cash advances were made to some employees." Division of Employment Security Deputy's Determination Concerning Claim for Benefits by Lawrence Manser. (Manser deposition Exhibit 10.) Plaintiff did not appeal the deputy's determination. Manser's April 25, 1984, deposition at pp. 208–09. Defendant contends that because the deputy's finding of the reason for the discharge was a "final and binding determination," plaintiff has already had a full and fair opportunity to litigate the issue in Count I and thus is precluded from asserting in this action that plaintiff was discharged for some other reason.

Collateral estoppel will preclude relitigation of an issue if: 1) the issue is identical to one that was present in a prior adjudication; 2) there was a final judgment on the merits as to that issue; 3) the estopped party was a party to the prior adjudication; and 4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Oldham v. Pritchett*, 599 F.2d 274, 279 (8th Cir.1979).

The Division of Employment Security determined that plaintiff was discharged because of "several company violations" revealed during an audit. Defendant does not suggest that the Division considered, much less decided, whether plaintiff was discharged in order to interfere with ERISA protected rights under employment benefit plans. Therefore, the Division of Employment Security did not decide the identical issue presented by Count I of the complaint.

Furthermore, defendant has not established that plaintiff was afforded a "trial like hearing" before the Division, a prerequisite to giving its decision a preclusive effect. *See United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966).

Accordingly, the Missouri Division of Employment Security's determination that plaintiff was disqualified from receiving unemployment benefits for ten weeks will not collaterally estop plaintiff from litigating his claim that § 510 of ERISA was violated by his discharge.

### 2.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT I FOR FAILURE TO EXHAUST PLAN REMEDIES

Defendant argues that "exhaustion is required" before filing a claim in federal court under § 510 of ERISA and that plain-

tiff failed to exhaust administrative remedies provided in the benefit plans before filing this suit.

In *Amaro v. Continental Can Co.,* 724 F.2d 747 (9th Cir.1984), the defendant company's former employees brought suit under § 510 alleging that they were discharged for the purpose of being deprived of the opportunity to qualify for the company's benefit and employee welfare plans. The defendant argued that ERISA required terminated employees to exhaust contractual remedies prior to bringing a § 510 claim. *Id.* at 750.

In rejecting defendant's argument, the Court was persuaded by the difference between a § 510 claim and a breach of contract claim covered by the contractual remedies. A § 510 claim is not a breach of contract action but is "an alleged violation of a protection afforded by ERISA. There is no internal appeal procedure either mandated or recommended by ERISA to hear these claims." *Id.* at 751.

Furthermore, the Court noted that in resolving a § 510 claim, there is only a statute to interpret; a contract is not involved. Interpreting a statute "is a task for the judiciary, not for an arbitrator.... Therefore, a 'primary reason for the exhaustion requirement' ... is not present in this case." *Id.* at 751–52.

The Court in *Amaro* was persuaded by the reasoning in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) and *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) in which prior arbitration decisions were held not to foreclose actions under Title VII and the Fair Labor Standards Act:

> In enacting ERISA, Congress intended 'that *minimum standards be provided* assuring the equitable character of such plans....' Section 2 of ERISA, 29 U.S.C. § 1001(a) (emphasis added). *We do not believe Congress intended that these minimum standards could be eliminated by contract.* ERISA is intended to protect the interests of the pension plan participants 'by improving

> the equitable character ... of such plans *by requiring them to* [meet certain standards]....' Section 2 of ERISA, 29 U.S.C. § 1001(c) (emphasis added). *Congress did not intend section 510 of ERISA to be waivable.*

We are persuaded by the Supreme Court's willingness in *Barrentine* to extend the *Alexander* doctrine to statutory claims other than those arising under the Civil Rights Act. This indicates the Supreme Court's reasoning is based not on the *type* of non-waivable statutory right involved, but rather on placing realistic limits on the arbitration process when it is in tension with non-waivable statutory rights. Judicial procedures are more capable of safe-guarding individual statutory rights than are arbitral procedures. *See* n. 3, *supra.* Arbitrators 'very often are powerless to grant the aggrieved employees as broad a range of relief,' *Barrentine,* 450 U.S. at 745, 101 S.Ct. at 1447, as is available under ERISA. *See* 29 U.S.C. § 1132.

724 F.2d at 752. Therefore, the *Amaro* Court held that the former employees were not required to exhaust grievance or arbitration procedures prior to bringing a § 510 cause of action. *Id.*

In *Zipf v. American Telephone & Telegraph,* 799 F.2d 889 (3rd Cir.1986), plaintiff filed a complaint in federal court alleging that her termination one day before she would have been potentially eligible to receive substantial disability benefits under an employee benefit plan violated § 510 of ERISA. Defendant argued that plaintiff was required to submit her § 510 claim to the internal administrative remedies made available by the plan before seeking judicial relief. In reversing the district court's decision requiring exhaustion, the Court stated:

> We decline AT & T's invitation to find in ERISA an implied exhaustion requirement applicable to substantive rights conferred by that Act. First, we find no indication in the Act or its legislative history that Congress intended to condition a plaintiff's ability to redress a stat-

utory violation in federal court upon the exhaustion of internal remedies. The provision relating to internal claims and appeals procedures, Section 503, refers only to procedures regarding claims for *benefits*. There is no suggestion that Congress meant for these internal remedial procedures to embrace Section 510 claims based on violations of ERISA's substantive guarantees.

On the contrary, the legislative history suggests that the remedy for Section 510 discrimination was intended to be provided by the courts. 2 *Legislative History of the Employee Retirement Income Security Act of 1974*, 1641–42 (1976) (remarks of Sens. Hartke and Javits). Indeed, an amendment that would have created an administrative remedy for Section 510 claims, to be established by the Department of Labor, was defeated. *See Id.*, at 1774–75, 1835–37.

799 F.2d at 891–92 [footnotes omitted]. The Court reaffirmed *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923 (3rd Cir.1985) in which it was held that claims to enforce rights to benefits under 29 U.S.C. § 1132(a) that are independent of the substantive provisions of ERISA are subject to arbitration while claims of statutory violations can be brought in federal court notwithstanding an agreement to arbitrate. 799 F.2d at 892. Furthermore, the Court stated:

> When a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits. This ensures that the appeals procedures mandated by Congress will be employed, permits officials of benefit plans to meet the responsibilities properly entrusted to them, encourages the consistent treatment of claims for benefits, minimizes the costs and delays of claim settlement in a nonadversarial setting, and creates a record of the plan's rationales for denial of the claim. . . .

However, when the claimant's position is that his or her federal rights guaranteed by ERISA have been violated, these considerations are simply inapposite. Unlike a claim for benefits brought pursuant to a benefits plan, a Section 510 claim asserts a statutory right which plan fiduciaries have no expertise in interpreting. Accordingly, one of the primary justifications for an exhaustion requirement in other contexts, deference to administrative expertise, is simply absent. Indeed, there is a strong interest in judicial resolution of these claims, for the purpose of providing a consistent source of law to help plan fiduciaries and participants predict the legality of proposed actions. Moreover, statutory interpretation is not only the obligation of the courts, it is a matter within their peculiar expertise. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974).

799 F.2d at 892–93. Therefore, "an employee with a claim under § 510 of ERISA need not submit that claim to the plan before seeking relief in a federal district court." *Id.* at 893.

The distinction between a claim seeking benefits that are independent of claims based on violations of the substantive provisions of ERISA and a claim based on purely statutory rights created by § 510 of ERISA resolves the issue in the instant case. Because plaintiff claims that his discharge violated § 510, exhaustion of plan remedies is not a prerequisite to filing this suit.

In arguing that exhaustion is required, defendant primarily relies on *Amato v. Bernard*, 618 F.2d 559 (9th Cir.1980) and *Kross v. Western Electric Co., Inc.*, 701 F.2d 1238 (7th Cir.1983).

In *Amato*, a plan participant brought suit pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the trustees of a union pension trust seeking a declaration of the parties' rights and duties under the trust and alleging bad faith dealings by the trustees. The Court required exhaustion of plan remedies because § 503, 29 U.S.C.

§ 1133, requires certain administrative remedies be incorporated in every plan and because of the assistance courts receive by pension plan trustees interpreting their own plans. 618 F.2d at 567–68.

In *Kross*, plaintiff alleged pursuant to § 510 that his employer discharged him to prevent him from attaining rights under certain health, benefit and pension plans. Relying primarily on *Amato*, the Court concluded that plaintiff was precluded from bringing the suit in federal court because he had failed to exhaust available administrative remedies. 701 F.2d at 1244–45. In response to plaintiff's contention that his suit involved "purported violations of ERISA, rather than the provisions of a particular pension plan, and thus only a federal court is qualified to consider the plaintiff's claims[,]" the Court simply stated: "We find these arguments to be insufficient to override the well-established federal policy, and supporting case law, favoring exhaustion of administrative remedies prior to bringing an ERISA-based lawsuit in federal court." *Id.* at 1245.

Because *Amato* only involved the question of whether the exhaustion of remedies doctrine applies to a claim for benefits brought pursuant to § 502, and not pursuant to § 510, and because *Kross* relied on *Amato* but did not analyze whether exhaustion should be required under § 510 (*see Amaro*, 724 F.2d at 752 (finding *Kross* to be based on a "flawed premise")), neither decision is as persuasive as *Amaro* and *Zipf*.

Also, defendant's reliance on *Anderson v. Alpha Portland Industries, Inc.*, 727 F.2d 177, (8th Cir.1984), *aff'd* 752 F.2d 1293 (8th Cir. en banc 1985) is misplaced. The claim in *Anderson* was brought under § 502 of ERISA, not § 510. Thus, although the Court stated that "[o]ther circuits have applied [the] exhaustion requirement to suits under ERISA," 727 F.2d at 180, the Court was referring to decisions such as *Amato* which only addressed § 502, and *Kross*, which did not address the difference between §§ 502 and 510.

### 3.
### DEFENDANT'S MOTION TO DISMISS COUNT III

Plaintiff alleges in Count III that defendant intentionally "and lawfully" discharged him from employment with the intent to injure him "by depriving him of the profits of employment, by depriving him of the benefits of the health and disability plans described above, and by depriving him of sick leave pay." Plaintiff later described the claim asserted in Count III as follows:

> Plaintiff's claim of wrongful discharge in Count III is based on the legal theory of prima facie tort.... The prima facie tort doctrine was adopted in Missouri in *Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo.App.1980).... Missouri has implicitly recognized that the discharge of an employee at will may be actionable on a prima facie tort theory. *Lundberg v. Prudential Life Insurance Co. of America*, 661 S.W.2d 667 (Mo.App.1983).

Plaintiff's Suggestions in Opposition to Defendant's Motion to Dismiss Count III, or, in the Alternative, for Summary Judgment at p. 1.

Defendant seeks dismissal of Count III because the claim asserted has been preempted by federal law. In the alternative, defendant moves for summary judgment on Count III because it fails to state a claim under Missouri law.

In *Dake v. Tuell*, 687 S.W.2d 191 (Mo. banc 1985), the Court considered whether "discharged at will employees can maintain a suit for wrongful discharge against their former employers by cloaking their claims in the misty shroud of prima facie tort." *Id.* at 192. After reiterating the well established rule that an employee at will cannot maintain an action for wrongful discharge against his former employer, the Court concluded:

> Here, plaintiffs would have us render near impotent this long standing legal principle—by establishing a rule that would permit an at will employee to bring an action for wrongful discharge

under the guise of the prima facie tort doctrine. This we decline to do.

*Id.* at 193 [footnote omitted].

In *Dake,* the plaintiff argued that *Lundberg v. Prudential Insurance Company of America,* 661 S.W.2d 667 (Mo.App.1983) "implicitly recognizes the right of a discharged at will employee to rely upon the prima facie tort doctrine to state a viable cause of action against the former employer." The Court stated that plaintiff's reliance on *Lundberg* was "misplaced." *Dake,* 687 S.W.2d at 193 n. 4.

■ Accordingly, because Count III fails to state a cause of action under Missouri law, defendant's motion for summary judgment will be granted. Defendant's motion to dismiss Count III on the basis of federal preemption and its motion for summary judgment on Count III based on the doctrine of collateral estoppel are moot.

### 4.
### DEFENDANT'S MOTION TO DISMISS COUNT IV FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

In Count IV plaintiff alleges that he was provided with an employee handbook and manual stating that any employee who was dismissed for unsatisfactory work performance would be provided with notice of the unsatisfactory performance and an opportunity to correct it. Plaintiff states that he relied on these dismissal procedures when he accepted employment with defendant. Nevertheless, plaintiff asserts that he was not provided an opportunity to correct his performance before he was discharged and that defendant thereby breached its agreement with plaintiff by failing to comply with the provisions of the employee handbook and manual.

Defendant moves to dismiss Count IV on two grounds. First, defendant alleges that plaintiff was an at will employee and that Missouri does not recognize a "handbook exception" to the at will employment doctrine.

In *Amaan v. City of Eureka,* 615 S.W.2d 414, 415 (Mo. banc 1981), the Court stated that: "[I]n the absence of a contract for employment for a definite term or a contrary statutory provision, an employer may discharge an employee at any time, without cause or reason, or for any reason and, in such cases no action can be obtained for wrongful discharge...." However, in *Arie v. Intertherm, Inc.,* 648 S.W.2d 142 (Mo.App.1983), the Court recognized that contractual rights could arise from an employee handbook containing employer's policy statements:

> We believe that, where as here, upon the hiring of an employee said employee is given a handbook containing policy statements of the employer and rules of employment there arises contractual rights in the employee without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and this despite the fact the statement of policy is not signed by the parties and could be unilaterally amended by the employer without notice to the employee, and contains no reference to any specific employee, his job description or compensation.

*Id.* at 153.

In *Enyeart v. Shelter Mut. Ins. Co.,* 693 S.W.2d 120 (Mo.App.1985), a discharged employee alleged that the provisions pertaining to dismissal in the employee's handbook gave rise to contractual rights upon which the employee could maintain a claim for wrongful discharge. The trial court dismissed the employee's petition for failure to state a claim. The Missouri Court of Appeals reversed stating:

> [W]e conclude the law to be that if an employer elects to establish policies in its relations with employees and publishes those policies in a document distributed to employees, the employer is contractually bound to observe those policies until they are modified or withdrawn. The entitlement of the employee to enforce observance of the policies does not depend on any express agreement mutually announced or the naming of a particular

employee or job description. All employees comprising the work force when the policies are adopted as well as those later hired while the policies are in force are equally entitled to require adherence by the employer to the terms and provisions of employment policy appearing in the published statement.

*Id.* at 123. *See also Gavan v. Madison Memorial Hosp.*, 700 S.W.2d 124 (Mo.App. 1985).

■ Thus, policy statements in employee handbooks can give rise to contractual employment rights where the provisions induce an employee to accept or retain employment. Because plaintiff alleges that an employee handbook restricted the manner in which he could be terminated and that defendant did not afford him the procedural rights outlined in the handbook, plaintiff has alleged a claim upon which relief may be granted.

■ For its second ground for dismissal, defendant argues that because plaintiff does not have a viable claim for breach of contract under Missouri law, Count IV is merely a claim for benefits and, therefore, is preempted by ERISA. However, as previously discussed, Missouri now recognizes that contractual rights can arise from an employee's reliance on employer distributed handbooks and manuals. Accordingly, because Count IV alleges a claim upon which relief may be granted, defendant's motion for dismissal of Count IV on the basis of preemption will be denied.

As an alternative to its motion to dismiss, defendant seeks summary judgment on the ground that plaintiff's conduct did not entitle him to any pre-termination rights under the employee handbook and therefore his dismissal did not breach any alleged employment agreement.

The employee handbook and manual provided that defendant could terminate an employee either (1) "for cause," or (2) for failure to provide satisfactory work performance. An employee could be dismissed "for cause" for "dishonorable conduct, dishonesty, misrepresentation on the employment application, failure to conform to company policies and any other cause deemed sufficient for discharge at the discretion of management." Only if an employee were dismissed for unsatisfactory work performance was the employee entitled to notice of and an opportunity to correct the work problem prior to dismissal. No pre-termination obligations apply if the discharge is "for cause."

Defendant argues that plaintiff was discharged "for cause" and, therefore, he was not entitled to notice and opportunity to correct the alleged work problem before dismissal. Plaintiff responds that he was dismissed for unsatisfactory work performance and, therefore, defendant breached its contractual obligations by failing to provide plaintiff with notice and an opportunity to correct the problem.

The dispute between the parties focuses on the reason plaintiff was terminated. Defendant relies on plaintiff's testimony that he held onto sales tickets for customers beyond the time these tickets were to be processed.

In an effort to create a factual dispute over why plaintiff was terminated, plaintiff relies exclusively on the following testimony from plaintiff's supervisor:

Q. (By Mr. Gallagher) Well, I don't know how I can make it more clear. You consider what Mr. Manser did to be unsatisfactory job performance?

A. Yes, sir.

Q. And that only.

A. Yes, sir.

Q. And these are items that were never called to Mr. Manser's attention for correction prior to the time they were discovered in the audit; is that correct?

A. That is correct.

Bryan's April 25, 1984, deposition at pp. 126–27.

On its face, even if this testimony is taken out of context, Bryan is not testifying that plaintiff was *discharged* for unsatisfactory work performance. All he is saying is that he considered what plaintiff did to be unsatisfactory performance. In con-

text, it is even more apparent that Bryan was not saying that plaintiff was discharged for unsatisfactory work performance. As answers to previous questions reveal, plaintiff held on to sales tickets for customers beyond the time these tickets were to be processed. Plaintiff's counsel was only attempting to get Bryan to state whether "the things Mr. Manser did [were] more in the vein of unsatisfactory performance than intentional misconduct." *Id.* at 126, lines 11–14.

Furthermore, Bryan's testimony that plaintiff relies on must be viewed in light of what Bryan had testified that plaintiff had done. For instance, Bryan had testified earlier that "the primary reasons for discharging Mr. Manser related to the unprocessed sales tickets, the unbilled fertilizer, and the drafts not properly processed." *Id.* at 122–23. These are the very acts that plaintiff concedes violated company policy. Plaintiff testified at his deposition:

Q. And is it your testimony sometimes you would hold those [sales tickets] for as long as a month or two?

A. Yes.

Q. Why would you not simply run them through the accounting records and the accounting process and send them off to Columbia?

A. That would show up on the aging as being charged to the account past 60 days.

Q. And if that happened, then Mr. Bryan would be yelling at you for extending credit to people who are already past 60 days; right?

A. Yes.

Q. And you did not want that to happen; right?

A. Right.

Manser's December 6, 1984, deposition at p. 47.

Also, plaintiff testified that he delayed the processing of certain fertilizer slips so that a customer would receive credit when in fact he was not entitled to it:

Q. Mr. Manser, did you ever while you were exchange manager deliberately delay processing charge slips or fertilizer slips so that a customer would receive credit when, in fact, that customer was not entitled to it because his account was past due 60?

A. Yes. As I said, on some of these tickets over here.

Q. And did you do that during the Fall of 1981?

A. Probably did, according to these tickets anyway.

Manser's April 25, 1984, deposition at p. 126.

Plaintiff conceded that he did not process tickets properly:

Q. What was your purpose in holding tickets like Exhibit 13?

A. Well, sometimes you could save a customer that way.

Q. And how would that happen?

A. Well, for an example, say you had a customer that, a large dollar customer, and one I can think of in particular that this happened habitually with, would let his account get past 60 days. And he had a hired man and he had a herd of cows. And the hired man sometimes would call up about 4 or 4:30 and say, 'I can't make it in by 5. Could you throw me out 20 bags of corn for Joe's old cows to feed this evening?' And rather than say, 'No, the cows aren't getting any feed because old Joe's account is 60 days past due,' you go ahead and put it on the dock for him, make up the ticket, and he would be in, you know, in a short time, whatever, and you would say, 'Look, we have got to settle up this account and pick up this ticket at the same time.'

Q. And is it your testimony sometimes you would hold [sales tickets] for as long as a month or two?

A. Yes.

Manser's December 6, 1984, deposition at pp. 46–47.

Plaintiff testified that he knew it would be a violation of company policy to extend credit to customers whose accounts were delinquent.

Q. At any rate, as a result of your attending those district manager meet-

ings or district meetings, did you understand it would be a very serious infraction of company policy if you did extend credit to customers who were delinquent beyond 60 days?

A. Yes, it would be.

Manser's December 6, 1984, deposition at pp. 50–51.

Plaintiff's supervisor testified that plaintiff was discharged because of "the unprocessed sales tickets, the unbilled fertilizer and the drafts not properly processed." Bryan's April 25, 1984, deposition at pp. 122–23.

 Therefore, the excerpt from Bryan's deposition relied on by plaintiff does not create a dispute of material fact over whether plaintiff was discharged "for cause" or because of unsatisfactory work performance. On the record presented by the parties in accordance with Rule 56(e), plaintiff was discharged for violating company policy, not unsatisfactory work performance. Therefore, because plaintiff was discharged "for cause," plaintiff was not entitled to the benefit of the procedures provided in the employee handbook only for employees terminated for unsatisfactory work performance.

### ORDER

For the reasons stated, it is hereby ORDERED that:

1) defendant's motion for summary judgment on Count I on the ground of collateral estoppel is denied;

2) defendant's motion for summary judgment on Count I on the ground of exhaustion is denied;

3) defendant's motion for summary judgment on Count III for failure to state a claim is granted;

4) defendant's motion to dismiss Count III on the ground of preemption is denied as moot;

5) defendant's motion for summary judgment on Count III on the ground of collateral estoppel is denied as moot;

6) defendant's motion to dismiss Count IV for failure to state a claim is denied;

7) defendant's motion to dismiss Count IV on the ground of preemption is denied; and

8) defendant's motion for summary judgment on Count IV is granted.