2312

Julian Harris SHELTON, Appellant v. OSCAR MAYER FOODS CORPO-
RATION, d/b/a Louis Rich, a wholly owned subsidiary of Phillip Morris
Companies, Inc., Barton Protective Services, Inc., and William Brown, of
which Oscar Mayer Foods Corporation, d/b/a Louis Rich, a wholly owned
subsidiary of Phillip Morris Companies, Inc., is the Respondent.

(459 S.E. (2d) 851)

Court of Appeals

*C. Richard Kelly,* Columbia, and *Samuel M. Price, Jr.,* Newberry, *for appellant.*

*Thomas A. Bright* and *Mary C. McCormack, Haynsworth, Baldwin, Johnson & Greaves,* Greenville, *for respondent.*

Heard Feb. 7, 1995; Dec. Feb. 27, 1995.

Ref. June 14, 1995; Reh. Den. Aug. 10, 1995.

## ORDER GRANTING PETITION FOR REHEARING

*Per Curiam:*

After a careful consideration of the parties' respective Petitions for Rehearing, it is ordered that the opinion heretofore filed, Op. No. 2312, filed February 27, 1995, be withdrawn and

the attached opinion be substituted. The Petitions for Rehearing are granted without oral argument.

GOOLSBY, Judge:

This case arises out of an alleged wrongful termination of employment and, so far as is pertinent here, involves claims by Julian Harris Shelton against Louis Rich, a subsidiary of Oscar Mayer Foods Corporation, for breach of contract, breach of contract accompanied by a fraudulent act, fraudulent misrepresentation, and breach of covenant of good faith and fair dealing. Louis Rich discharged Shelton after a security guard reported he observed Shelton and another employee smoking marijuana in the Louis Rich parking lot. Judge James W. Johnson, Jr., granted Louis Rich's motion for a directed verdict on the breach of contract claim. All other claims were previously disposed of on motions to dismiss or for summary judgment by either Judge Johnson or Judge T.L. Hughston, Jr. Shelton appeals. We affirm in part, reverse in part, and remand.

Shelton worked at the Louis Rich processing plant in Newberry. When he was hired, he received the 1979 employee handbook. The handbook contained employee conduct rules and company policies. In 1983, Louis Rich distributed another handbook that included a change in company policies, but Louis Rich did not otherwise notify the employees of the change. In 1987, William Brown, a security guard, told Louis Rich management that he had observed Shelton and a co-worker smoking marijuana in the Louis Rich parking lot in the co-worker's van. There is conflicting testimony concerning whether Louis Rich investigated the allegation before it discharged Shelton. Shelton claims Louis Rich failed to "[e]nsure," as its handbook provided, that its rules governing employee conduct "[would] be enforced fairly and equally with regard to all employees."

I.

Shelton first argues Louis Rich was collaterally estopped from relitigating a factual issue that was decided during a contested hearing conducted by the South Carolina Employment Security Commission (ESC) to determine whether Louis Rich discharged Shelton for cause.

The issue of whether collateral estoppel applies to rulings of the ESC has never been directly addressed by the appellate courts of this state.[1]

In deciding whether collateral estoppel should apply to factual findings of the ESC, we look first to the purposes served by ESC hearings.

S.C. Code Ann. § 41-27-20 (1986) sets forth the public policy underlying South Carolina Employment Security Law as follows:

> Economic insecurity due to unemployment is a serious menace to health, morals and welfare of the people of this State; involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the General Assembly to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family; the achievement of social security requires protection against this greatest hazard of our economic life; this can be provided by encouraging the employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide

---

[1] *See Bennett v. South Carolina Dep't of Corrections*, 305 S.C. 310, 312, 408 S.E. (2d) 230, 231 (1991) (holding generally that "under the doctrines of res judicata and collateral estoppel, the decision of an administrative tribunal precludes the relitigation of the issues addressed by that tribunal in a collateral action."). Despite the apparently broad holding of *Bennett*, the case specifically dealt with the application of collateral estoppel to a proceeding before the State Employee Grievance Committee. Bennett filed a complaint with the grievance committee and the grievance committee ruled in favor of the employer. Instead of appealing this decision through the proper administrative channels, Bennett filed a civil action alleging he was discharged in retaliation for filing a workers' compensation claim. The supreme court held the circuit court properly granted the employer's summary judgment motion because the issues in Bennett's civil claim were identical to the issues the grievance committee had already ruled upon in favor of the employer. Bennett had abandoned any opportunity for a ruling on these issues in his favor when he failed to appeal the grievance committee's findings.

Because state employees must bring complaints before the grievance committee prior to seeking judicial review, the hearing before the grievance committee is necessarily more in the nature of a full-blown evidentiary hearing than the summary proceeding before the ESC, which simply determines whether an employee may receive unemployment benefits. The differences in the form and nature of the proceedings before the grievance committee and the ESC warrant our specific consideration of whether collateral estoppel should apply to ESC findings.

benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The General Assembly therefore declares that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

It is evident that the legislature intended to keep procedural hurdles to a minimum so as to enable unemployed claimants to obtain prompt decisions regarding benefits from the ESC. *See, e.g., California Dep't of Human Resources Dev. v. Java*, 402 U.S. 121, 135, 91 S.Ct. 1347, 1356, 28 L.Ed. (2d) 666, 676 (1971) (holding that the congressional objective of employment security systems is to get "money into the pocket of the unemployed worker at the earliest possible point that is administratively feasible.").

Because of the policy underlying ESC hearings, the narrow issue the ESC decides is simply whether the claimant's discharge was with or without cause in order to determine whether the claimant should receive unemployment benefits. Employers are not likely to fully litigate all issues before the ESC because the matter in controversy is comparatively small. Further, claimants are generally likely to be unrepresented by counsel at these hearings. If collateral estoppel applied to ESC decisions, ESC hearings would essentially become forums for employers and employees to engage in lengthy civil litigation over claims relating to an employee's discharge. This, we feel, would frustrate the intent underlying the employment security law.

After full consideration of the policy reasons behind South Carolina Employment Security Law and the implications of applying collateral estoppel to ESC findings, and after a review of the case law of other states dealing with this issue,[2]

---

[2] *See Salida Sch. Dist. R-32-J v. Morrison*, 732 P. (2d) 1160, 1165 (Colo. 1987) (holding collateral estoppel should not apply to ESC findings because "[i]f findings entered at an unemployment compensation hearing may be used to establish the employer's liability for unlawful discharge in a subsequent lawsuit, the employer would have a strong incentive to use its superior resources consistently to oppose a discharged employee's claim for unemployment bene-

we hold the better rule is not to apply collateral estoppel to ESC findings. This decision leaves the employer and employee free to litigate any civil claims in the proper forum while preserving the function and purpose of ESC hearings, *i.e.*, to expedite benefits decisions for workers who become unemployed through no fault of their own.

## II.

Shelton also argues the trial court erred in granting a directed verdict in favor of Louis Rich on Shelton's breach of contract claim. We agree.

## A.

In *Small v. Springs Indus., Inc.*, 292 S.C. 481, 357 S.E. (2d) 452 (1987), the Supreme Court held an employee handbook could constitute a contract, thereby altering an employee's at-will status. The court also recognized that, under the common law, a trial court should submit to the jury the issue of the existence of a contract when its existence is questioned and the evidence is either conflicting or admits of more than one inference. Specifically, the court held it was for a jury to deter-

---

fits. Issues presented to the [ESC] will be contested strongly, and the hearings will become lengthy and more detailed, and will no longer be suited to the prompt resolution of unemployment compensation claims."); *see also, Kelley v. TYK Refractories Co.*, 860 F. (2d) 1188 (3d Cir. 1988) (factual finding of unemployment compensation board that employee voluntarily quit was not entitled to collateral estoppel effect in employee's civil suit in light of differing policies underlying the unemployment compensation scheme and the civil rights statute); *Lamborn v. W.C.A.B. (Armoroso Baking)*, 656 A. (2d) 593 (Pa. 1995) (refusing to give collateral estoppel effect to unemployment compensation board's decision in employee's subsequent worker's compensation appeal); *Case v. Lower Saucon Township*, 654 A. (2d) 57 (Pa. 1995) (finding of unemployment compensation board that employee was not discharged for wilful misconduct did not preclude employer from defending employee's discharge); *Shovelin v. Central N.M. Elec. Co-op., Inc.*, 850 P. (2d) 996 (N.M. 1993) (holding the trial court did not err in refusing to give preclusive effect to findings of the Employment Security Department); *Teamsters Local Union No. 273 v. CSX Beckett Aviation, Inc.*, 687 F. Supp. 985 (W.D. Pa. 1988) (finding of unemployment compensation board did not collaterally estop litigation of whether employee's discharge was for just cause under terms of labor agreement); *Zlotnicki v. Harsco Corp.*, 672 F. Supp. 161 (M.D. Pa. 1987) (unemployment compensation board's determination that employee had not engaged in wilful misconduct did not have preclusive effect in wrongful discharge litigation); *Manser v. Missouri Farmers Ass'n*, 652 F. Supp. 267 (W.D. Mo. 1986) (unemployment compensation board's decision did not preclude litigation of employee's ERISA claim).

mine whether an employee handbook constituted an employment contract. *Id.*

On appeal from a directed verdict, a court must view the evidence and all its reasonable inferences in the light most favorable to the nonmoving party. If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied. *Whelan v. Welch,* 304 S.C. 548, 405 S.E. (2d) 836 (Ct. App. 1991).

Viewing the evidence and its reasonable inferences in the light most favorable to Shelton, the nonmoving party, we hold the language of the 1979 employee handbook could have created an employment contract. In *Small,* the supreme court held that "[i]t is patently unjust to allow an employer to couch a handbook . . . in mandatory terms and then allow him to ignore these very policies as 'a gratuitous, nonbinding statement of general policy' whenever it works to his disadvantage," and that once an employer voluntarily chooses to publish a handbook and "assure[s] the employees that the provisions of [the handbook] w[ill] be followed," the employer may be held liable for breach of contract. *Small,* 292 S.C. at 485, 357 S.E. (2d) at 454-55.

The handbook language at issue here, when referring to the Employee Rules of Conduct, reads in pertinent part: "These rules are a fair way to protect everyone and the company *will [e]nsure* that these rules *will be enforced* fairly and equally with regard to all employees." (Emphasis added.) This is not a case where the employer has merely made general, gratuitous assurances of fair dealing, as Louis Rich would have us hold. *See, e.g., Mills v. Leath,* 709 F. Supp. 671, 674 (D.S.C. 1988) (holding handbook language that stated "disciplinary actions taken against employees are fair, equitable and consistent in all departments" did not alter the employee's at-will status). Rather, it is a case where the employer, by inserting mandatory language in its employee handbook, has expressly guaranteed its employees that it will implement and adhere to the rules outlined in the handbook.

The trial court, therefore, erred in directing a verdict in favor of Louis Rich on the issue of the existence of an employment contract. The issues of the existence of a contract, any breach of the contract, and any damages resulting from the

breach should have been submitted to the jury.

### B.

In light of the South Carolina Supreme Court's recent decision in *Fleming v. Borden, Inc.*, 316 S.C. 452, 450 S.E. (2d) 589 (1994), we address the issue of actual notice, an issue Louis Rich raised as a defense but the trial court did not reach in directing a verdict for Louis Rich.

Louis Rich contends Shelton's alleged actual knowledge of the 1983 disclaimer provides an additional sustaining ground for the trial court's directed verdict. Rules 207(b)(2) and 220(c), SCACR. The facts relevant to this defense are as follows: Louis Rich issued a revised employee handbook in 1983 that added, in addition to the above-quoted language, a disclaimer that read "[i]t should also be recognized that the language used in this handbook is not intended to create a contract of employment and that employment is terminable at the will of either the employee or the employer." Although the trial court found the disclaimer inconspicuous as a matter of law, Louis Rich attempted to show at trial that, even if the 1979 handbook created an employment contract, the 1983 handbook unilaterally terminated that contract and controlled the employment relationship because Shelton allegedly had actual knowledge of the disclaimer.

*Fleming*'s facts are very similar to those in this case. Borden, the employer, claimed that, even if the handbook originally issued to Fleming, its employee, had created a contractual relationship between Fleming and Borden, Borden had nonetheless unilaterally changed her status to that of an at-will employee with a disclaimer in a subsequently issued employee handbook. Fleming said she received the new handbook but she was not notified of any changes, much like Shelton. The supreme court held that, although an employer may modify a contract created by an employee handbook with a subsequent employee handbook, the employee must have reasonable notice of the modification for it to be effective, and, in the employment context, "reasonable notice" requires *actual notice* to the employee. *Fleming*, — S.C. at —, 450 S.E. (2d) at 595-96. The court further held that the question of whether the employer provided actual notice of a modification of the employment contract created by an employee handbook in

most cases will be a question for the jury to determine. *See id.* at —, 450 S.E. (2d) at 596 ("Where, as here, the employee admitted receiving the handbook but claimed she was not notified that the new handbook contained significant changes, a question of fact was created as to whether [the claimant] received actual notice of her change to employee at-will status."); *cf. King v. PYA/Monarch, Inc.*, 453 S.E. (2d) 885 (S.C. 1995) (Davis Adv. Sh. No. 1 at 16) (actual notice requirement met where employee admitted he read and understood the new agreement but allegedly signed it "under duress"); *Adams v. Square D Co.*, 775 F. Supp. 869 (D.S.C. 1991) (actual notice requirement met where employee actually drafted the handbook at issue per the employer's instructions).

Based on the record before us, we decline to hold as a matter of law that Shelton had actual knowledge of the disclaimer in the revised handbook because there is no evidence that he read and understood the disclaimer. In reaching this conclusion, we note Shelton's testimony that, although he "glanced" at the page containing the disclaimer, he did not read the new handbook. Indeed, he "pretty much understood," after receiving the new handbook, that "you had to do something wrong to get fired."

## V.

Shelton further argues the trial court erred in granting Louis Rich summary judgment on Shelton's claim for breach of contract accompanied by a fraudulent act and fraudulent misrepresentation.

To recover for breach of contract accompanied by a fraudulent act Shelton must prove: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 336 S.E. (2d) 502 (Ct. App. 1985). There is no evidence Louis Rich had any intent to defraud Shelton. Furthermore, the alleged fraudulent act, the revision of the handbook in 1983, occurred four years before the alleged breach of contract when Shelton was discharged in 1987. The 1983 revision clearly was not a closely connected dishonest act sufficient to support Shelton's claim. *Id.*

Shelton's claim is essentially one for breach of a ██ promise of fair treatment. Proof that Louis Rich made a promise and then broke that promise four years later is simply not evidence of fraud. To support a fraud claim, an alleged misrepresentation "must be one of an existing fact, not merely . . . . promises or statements as to future events which later were unfulfilled." *Schie v. Gay & Taylor, Inc.*, 290 S.C. 31, 34, 347 S.E. (2d) 910, 912 (Ct. App. 1986); *Darby v. Waterboggan of Myrtle Beach, Inc.*, 288 S.C. 579, 344 S.E. (2d) 153 (Ct. App. 1986).

## VI.

Finally, Shelton argues the trial court erred in directing a verdict for Louis Rich on Shelton's cause of action for breach of implied covenant of good faith and fair dealing. We agree.

Under South Carolina law, there exists in *every* con- tract an implied covenant of good faith and fair dealing. *Parker v. Byrd*, 309 S.C. 189, 420 S.E. (2d) 850 (1992). Further, we find no authoritative case law holding the implied covenant of good faith and fair dealing is not applicable to employment contracts that alter the employee's at-will status. If, therefore, the jury finds the handbook issued to Shelton created an employment contract that altered his at-will status, then the question of whether Louis Rich breached an implied covenant of good faith and fair dealing based on an employment contract is for the jury to decide.

## VII.

In summary, we reverse the grant of a directed verdict for Louis Rich on Shelton's breach of contract claim. We also reverse the dismissal of Shelton's claim for breach of implied covenant of good faith and fair dealing. We remand for a new trial on these two claims.

Affirmed in part, reversed in part, and remanded.

SHAW, J., and HOWARD, A.J., concur.