**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONNA LYNN MCCALL,
Plaintiff-Appellee,

v.

No. 96-1201

MYRTLE BEACH HOSPITAL,
INCORPORATED, d/b/a Grand Strand
General Hospital,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CA-94-1671-22JI)

Argued: April 9, 1997

Decided: September 10, 1997

Before HALL and MURNAGHAN, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mark E. Edwards, Nashville, Tennessee, for Appellant.
James L. Hills, Myrtle Beach, South Carolina, for Appellee. **ON
BRIEF:** J. Gail Rahn, Patricia L. Quentel, RAHN & ASSOCIATES,
P.A., Charleston, South Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Myrtle Beach Hospital, Inc. (Hospital), appeals a judgment entered on the verdict of a jury in favor of Donna Lynn McCall, finding that she was wrongfully terminated in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq., and that the Hospital breached a contract of employment with her. We affirm on the issue of liability with respect to both the ADA and contract causes of action; we vacate the award of damages and remand for reconsideration of the amount to which she is entitled.

I

McCall has suffered from Type 1, Brittle Diabetes since she was seven years old. She was hired by the Hospital in 1985 and worked as a night shift charge nurse in the obstetrics department. Obstetrics department policy required nurses to be on call for at least one 12-hour shift every other week. Many of McCall's call days were scheduled immediately before or after two consecutive work nights.

In 1990, McCall began to experience diabetic-related health problems. On numerous occasions between 1990 and 1992, McCall asked her supervisor, Sharon Sigwald, if she could be relieved of some of her call days, particularly the call shifts that were scheduled on top of two consecutive work nights. The parties dispute both the nature of McCall's requests and whether the Hospital made reasonable accommodations for McCall's requests during this two-year period.

On January 5, 1993, McCall was scheduled for a call day. She called in sick to the nursing supervisor complaining of nausea and vomiting. Sigwald called McCall at home and asked her to bring in a doctor's excuse when she returned to work. McCall returned to work the next evening but did not have a doctor's excuse. Sigwald met with

2

McCall in her office to discuss McCall's absence and her failure to bring in an excuse. Sigwald claimed that while they were in her office, McCall began "screaming and yelling in a rage" and directed profane remarks to her. In an employee counseling report, Sigwald wrote up McCall for insubordination and then met with hospital executives to discuss the situation. McCall was not present at that meeting. Later that evening Joyce Gardner, vice president of nursing, met with Sigwald and McCall to discuss the incident. As a result of the meeting, Gardner felt that McCall and Sigwald could not work together, and she discharged McCall for insubordination.

The Hospital moved for judgment as a matter of law on both causes of action at the close of McCall's evidence and at the close of all the evidence. The district court denied both motions.

The jury found that the Hospital discharged McCall in violation of the ADA and that it breached a contract of employment with her. It awarded damages which the district court later reduced. The Hospital again moved for judgment as a matter of law or, in the alternative, for a new trial. The court denied the motions, and the Hospital now appeals.

II

Judgment as a matter of law is warranted "when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." Singer v. Dungan, 45 F.3d 823, 826-27 (4th Cir. 1995) (citation omitted). The party moving for judgment as a matter of law, in this case the Hospital, is entitled to judgment if the nonmovant, McCall, failed to prove an essential element of her case upon which she has the burden of proof. Id. at 827. We must review the evidence in the light most favorable to McCall, who has the benefit of the jury's verdict. Id. A new trial should be granted when the verdict is "against the clear weight of the evidence or is based upon evidence which is false or will result in a miscarriage of justice." Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 594 (4th Cir. 1985) (citation omitted). We review the denial of a motion for a new trial for abuse of discretion. See Lindner v. Durham Hosiery Mills, Inc., 761 F.2d 162, 168 (4th Cir. 1985).

3

To establish a prima facie case for wrongful discharge under the ADA, McCall must prove "by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).

The judge charged the jury that McCall met the first element of her prima facie case as a matter of law--that her diabetes constituted a disability and that she was otherwise qualified as a registered nurse. The second element--that McCall was discharged--is undisputed by the parties. With respect to the third element, McCall offered evidence from which a jury could find that at the time of her discharge she was "performing her job at a level that met her employer's legitimate expectations" at the time of her discharge. Ennis, 53 F.3d at 58. The Hospital admits that up until her discharge, McCall was a "good nurse." Her personnel file revealed nothing to indicate that she had any history of abusive or combative behavior or any serious discipline problems. Sigwald admitted that "Donna is . . . a very good nurse" and that she "never had a problem with Donna." McCall's previous supervisors in the Hospital and a physician also spoke favorably of her performance and attitude.

The fourth prong of the prima facie case required McCall to prove that her discharge occurred "under circumstances that raise a reasonable inference of unlawful discrimination." Ennis, 53 F.3d at 58. McCall claims that on several occasions between 1990 and her termination, she requested relief from call days because of her diabetic-related health problems. She testified that the Hospital repeatedly ignored her requests for accommodations up until her discharge. She also testified that she complained to Sigwald about "[Sigwald] going around the department talking about me and saying that I called in all the time, that I was playing up my diabetes and high blood pressure stuff and that I really wasn't sick, and she was going to make me work calls like everybody else."

McCall testified that in September 1990 she gave Sigwald a doctor's note which stated: "Unable to Handle overtime [and] Extra Call

4

Days Due to medical illness. Please maintain Regular Schedule." McCall says she made several attempts to give the note to Sigwald. McCall and another witness testified that Sigwald ignored the doctor's note and told McCall that "it was too bad,[you are] . . . going to have to work those calls like everyone else." Another nurse testified that Sigwald made this same statement on another occasion while she was helping Sigwald plan the call schedule. There was also evidence, which Sigwald disputed, that shortly after being given the note, Sigwald stopped allowing other nurses to take McCall's call days for her. In 1992, after McCall returned from an eight-week medical leave caused by a diabetic related illness, she told Sigwald that she was still having trouble taking call days. Sigwald proposed to work with McCall on reducing her call days, but she still scheduled McCall for call days, including those shifts that were scheduled on top of work days.

The Hospital counters that McCall never asked to be completely relieved of call days. Sigwald said she never received the doctor's note from McCall in 1990 and that the plain language of the note only prohibited McCall from working extra call days. The Hospital showed that though McCall testified at trial that she did not want her call days scheduled on top of two consecutive work days, she testified in a prior deposition that she actually preferred working her call days on top of two consecutive workdays because it accommodated her sleeping pattern. The Hospital insisted that it accommodated McCall's request to schedule less of her call shifts on top of two consecutive work shifts. Hospital staffing records showed that McCall was scheduled to work a call shift on top of two work days just nine times between 1990 and 1992 and that she was only called into work on three of those shifts. The Hospital also claimed that Sigwald lightened McCall's call burden further by allowing other nurses to take calls for her for a period of time, by consistently scheduling her for less call days, and by calling her in as little as possible when she was on a call shift. Sigwald testified that when McCall returned from sick leave in 1992, she tried to give McCall as few call days as possible. The Hospital maintains that this evidence proves that it did not discriminate against McCall and that it accommodated her requests for a lighter call schedule.

The evidence discloses factual disputes pertaining to McCall's requests for relief and the adequacy of the Hospital's accommodation.

5

These disputes raise issues of credibility which the district court properly submitted to the jury. Much of the Hospital's evidence that it accommodated McCall came from Sigwald, and the jury was free to disbelieve her. The evidence was sufficient to raise a reasonable inference that McCall's discharge was proximately caused by the Hospital's unlawful discrimination. Consequently, McCall proved her prima facie case.

The Hospital offered a legitimate reason for McCall's firing--that she was insubordinate to both Sigwald and Gardner. Its explanation of why it discharged McCall satisfied its burden of producing a non-discriminatory reason for its action. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993). Upon McCall's establishment of a prima facie case and the Hospital's production of a nondiscriminatory reason for discharging McCall, the presumption of a prima facie case and the Hospital's burden of production are no longer relevant. Id. at 510. This leaves McCall with the burden of proving by a preponderance of the evidence that the Hospital discharged her in violation of the ADA. Id. at 511.

Insubordination would be a sufficient nondiscriminatory reason for firing McCall. See Martinson v. Kinney Shoe Corp ., 104 F.3d 683, 686 n.3 (4th Cir. 1997). The district court, however, properly ruled that there was a "complete dispute" on whether McCall was insubordinate and submitted this issue to the jury.

The parties painted different versions of the facts. Sigwald testified that when McCall called in sick on January 5, 1993, she asked her to bring in a doctor's excuse when she returned to work. She testified that McCall came into her office "screaming and yelling in a rage." Sigwald claimed the McCall refused to bring in a doctor's excuse and called Sigwald a "g--d---- bitch." The Hospital also offered evidence of a statement written by a nurse shortly after the incident in which the nurse claimed that she heard McCall "screaming in Sharon Sigwald's office." Another witness testified that McCall told her that during the meeting she got disgusted with Sigwald and told Sigwald to "kiss her ass." Gardner testified that in her meeting with Sigwald and McCall later that day, McCall refused to apologize to Sigwald and was so disrespectful towards her that at one point Gardner feared that McCall was "about to slap Sigwald."

6

McCall, however, presented sufficient facts to prove that she was not insubordinate and that the real reason for her termination was discrimination in violation of the ADA. McCall claims that she never raised her voice during her discussion with Sigwald and did not curse her. At trial, the nurse who gave Sigwald a statement that she heard McCall screaming in Sigwald's office testified that she did not see McCall at the time of the incident and could not identify the voice of the person she heard yelling. Two other Hospital employees working right outside Sigwald's office testified that they heard no screaming or yelling. McCall denied calling Sigwald any names during their meeting in Gardner's office and testified that it was Gardner, not she, who was upset and disrespectful during their meeting. The jury also heard evidence questioning Sigwald's reputation and temperament as a supervisor.

Since only McCall, Sigwald, and Gardner were present at the meetings, only they know what actually transpired. The conflicting evidence could only be resolved by assessing their credibility and the credibility of the witnesses who testified about the acts of insubordination and discrimination. It was the province of the jury to resolve these factual disputes.

The district court wisely required the jury to submit a special verdict. In answer to interrogatories, the jury found by a preponderance of the evidence that McCall's disability was a motivating factor in her discharge; that the Hospital stated a nondiscriminatory reason for the discharge; that by a preponderance of the evidence the proof showed that the Hospital's reason for discharging McCall was only a pretext or cover-up for discriminating against McCall; that the Hospital failed to make reasonable accommodation for McCall to enable her to work; that the Hospital did not make a good faith effort to make a reasonable accommodation after it was informed that accommodation was needed; and, finally, in answer to the question:"Has Defendant [Hospital] proved by a preponderance of the evidence that Plaintiff [McCall] would not have remained employed, even in the absence of discrimination because of her disability?", the jury answered: "No." Neither McCall nor the Hospital objected to the form or substance of the interrogatories the district court propounded to the jury.

7

Without weighing the credibility of the evidence, which we are forbidden to do, we cannot say that the Hospital was entitled to judgment as a matter of law on the ADA claim or to a new trial.

III

In a pendent claim, the jury found that the Hospital breached an express or implied contract of employment with McCall. The Hospital contends that no such contract existed and, in the alternative, that there was no breach.

Since there was no contract for a definite term, we proceed on the assumption that the Hospital hired McCall as an at-will employee. Hudson v. Zenith Engraving Co., 273 S.C. 766, 259 S.E.2d 812 (1979). South Carolina law provides that an employer may alter the at-will employment status through written or oral assurances to the employee that a particular disciplinary and termination process would be followed. King v. PYA/Monarch, Inc., 317 S.C. 385, 389, 453 S.E.2d 885, 888 (1995). Such assurances may create an express or implied contract of employment. See Small v. Springs Indus., Inc., 292 S.C. 481, 484-85, 357 S.E.2d 452, 454-55 (1987). Once the at-will employment status is altered and a contract is established, the employer is bound by an implied covenant of good faith and fair dealing. Shelton v. Oscar Mayer Foods Corp., 319 S.C. 81, 91, 459 S.E.2d 851, 857 (1995). The jury instructions accurately reflected South Carolina law on this issue, and the Hospital offered no objection to them.

There was sufficient evidence for the jury to decide, as a factual matter, that the Hospital made oral assurances to McCall that it would institute and administer a fair and impartial discipline policy. Susan Strange, human resources director at the Hospital, testified that the Hospital promised every employee that it would administer an impartial disciplinary system under which all employees would be treated "fairly." Several employees testified that the disciplinary procedures that the Hospital promised to follow included written or verbal warnings before termination. McCall testified:

> I was told that for disciplinary action that there would be verbal warnings and then written, and that one would have

8

to violate hospital policy repeatedly before actions were taken. There were procedures for counseling, and that you have to have three very bad write-ups for, or evaluations before someone could be terminated.

Sigwald testified that the discipline policy was discussed in the orientation program for employees. She admitted that the Hospital represented to all employees that its promise to administer a "fair and impartial" discipline system is a "contract" between the Hospital and its employees. Strange and former employees testified that guidelines for administering certain disciplinary procedures were contained in a supervisor's manual. The manual, however, was not admitted into evidence. The fact that McCall never received the manual does not insulate the Hospital from liability as to its contents. King, 317 S.C. at 390, 453 S.E.2d at 887.

Strange testified that it was Hospital policy to investigate any disciplinary violations registered against an employee. She also testified that any investigation was to be done by an "impartial" party and that it would not be typical to allow the person who witnessed the incident to conduct the investigation. The evidence, however, suggests that the only investigation into McCall's alleged outburst was conducted by Sigwald. Sigwald wrote up her version of the dispute in an employee counseling report. She also procured a note from a nurse indicating that she heard McCall screaming in Sigwald's office. The same nurse, however, testified that she did not recognize the voice she heard yelling. Sigwald then met with Strange, Gardner, and other Hospital administrators, including the Chief Executive Officer, to discuss the incident. McCall was not present at the meeting. There was conflicting testimony concerning whether termination was discussed at this meeting. Gardner then met with Sigwald and McCall to hear McCall's version of the events but terminated McCall for insubordination at the end of the meeting. Aside from Gardner's questioning of McCall during this meeting, the only substantive investigation of the incident was performed by Sigwald.

The Hospital asserts that McCall disclaimed any reliance on assurances that certain disciplinary procedures would be followed when she signed an "Acknowledgment Card and Receipt" of an employee handbook. But the handbook, to which the disclaimers in the

9

acknowledgment card applied, was never entered into evidence and McCall never claimed to rely on any assurances contained in the handbook. The Hospital has offered no evidence to show that the disclaimers contained in the acknowledgement card extended to the procedures detailed in the supervisor's manual or to the oral representations that Strange and Sigwald testified were made directly to every employee.

The Hospital denies that it altered McCall's at-will status by oral assurances. It also contends that the cases on which McCall relies, King and Small, are not applicable because they involved handbooks. We conclude, however, that the district court was justified in reading King and Small to instruct that "oral assurances" of personnel policies could alter at-will status. Indeed, King is explicit: "In Small v. Springs Industries, Inc., 292 S.C. 481, 357 S.E.2d 452 (1987), this Court held that whether an employer alters the at-will employment status through handbooks, bulletins, oral assurances, and similar materials, is a question for the jury." King, 317 S.C. at 389, 453 S.E.2d at 888 (emphasis added).

There was a sufficient ambiguity in the evidence concerning McCall's contract of employment to justify the district court's submission of the issue to the jury.

After the jury found an employment contract was established, it could also find that the Hospital breached an implied covenant of good faith and fair dealing when it discharged McCall. Shelton, 319 S.C. at 91, 459 S.E.2d at 857. Based upon the lack of written or verbal warnings, Sigwald's dominant role in the investigation, and the testimony that McCall's termination was discussed before McCall had offered her side of the story, there is sufficient evidence for a jury to infer that the hospital did not follow the procedures that it had represented to its employees and that it did not administer fair and impartial disciplinary proceedings against McCall before she was discharged.

IV

After the district court reduced the verdict because of an overlap of damages that McCall recovered on her ADA claim and her breach

10

of contract claim, it entered judgment in her favor against the Hospital in the amount of $445,000. The Hospital has assigned error to two aspects of the judgment. It contends that the evidence disclosed that McCall did not mitigate her damages and that her expert witness exaggerated economic projections for computing loss of future damages.

McCall was entitled to recover damages from the Hospital's breach "reduced by the amount [she] obtains, or through reasonable diligence could have obtained, from other suitable employment." Chastain v. Owens Carolina, Inc., 310 S.C. 417, 419-420, 426 S.E.2d 834, 835 (1993) (citation omitted). Before she was discharged on January 7, 1993, McCall was offered, but declined, a job transfer within the Hospital with no reduction in salary or benefits. Whether McCall's refusal of this offer was reasonable presented an issue for the jury. McCall testified that she could not go back to the "hostile environment" in the Hospital. The district court also considered the issue of reinstating McCall to another position in the Hospital on the ADA claim, but found that such action would subject McCall to a "hostile environment . . . that would be harmful to her physically." Under these circumstances McCall's refusal of the Hospital's offer did not show a lack of mitigation.

McCall testified that it took her eight months from the date of her discharge to find a new job. However, she rejected four other job offers in the Myrtle Beach area during the first two months after she was fired. Her only explanation for turning down each of these job offers was that none of the jobs was in the area of obstetrics and she "preferred" working with children. She eventually took an obstetrics job with the state of South Carolina working with developmentally delayed children.

Even though the first four job offers were not in McCall's specific field of choice, Gardner testified that the state does not restrict a licensed nurse such as McCall from practicing in other areas of specialization. She also testified that most hospitals provide refresher courses for nurses who are assigned to a new area of the Hospital. Because McCall declined not one, but four, similar positions as a licensed nurse in the Myrtle Beach area, she failed to show that she used reasonable diligence to mitigate her damages. McCall's damages

11

involving eight months of lost wages must be reduced by the amount that she could have obtained from the most remunerative of the employment offers she received in February and March of 1993. <u>See Chastain</u>, 310 S.C. at 419, 426 S.E.2d at 835.

McCall's economic expert calculated McCall's future contract damages by determining the difference between McCall's current salary and what her salary would have been with the hospital. He projected the differential of salary and benefits over a 30-year period. In projecting McCall's salary at the Hospital, he used a 7.5% yearly salary increase based upon the consumer price index for medical care. The Hospital, however, had a 3% cap on salary increases and McCall's previous three pay raises had been capped at this amount. The use of a yearly percentage increase for 30 years that was more than two times the amount of the Hospital's actual yearly percentage increase was unreasonable. We remand the issue of damages to the district court for further proceedings.

V

The district court was correct in denying the Hospital's motion for judgment as a matter of law and the motion for a new trial. The evidence pertaining to mitigation and future damages was insufficient to sustain the verdict.

<u>AFFIRMED IN PART; VACATED IN PART; AND REMANDED</u>

12